**Marshall N. JARVIS, II, et al.**

v.

**STAGE NECK OWNERS ASSOCIATION, et al.**

Supreme Judicial Court of Maine.

Argued June 9, 1983.

Decided Aug. 31, 1983.

---

Bernstein, Shur, Sawyer & Nelson, Peter J. Rubin (orally), Portland, for plaintiffs.

Jensen, Baird, Gardner & Henry, Merton G. Henry (orally), Portland, for Stage Neck Owners Assn., et al.

William D. Rymer (orally), pro se.

Strater, Hancock & Erwin, P.A., James S. Erwin, York, for Warricks.

Ayer, Hodsdon & Austin, Ralph W. Austin, Kennebunk, for defendants.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS and VIOLETTE, JJ.

ROBERTS, Justice.

Stage Neck Owners Association (Association), Stage Neck Inn (Inn) and other defendants appeal from a judgment of the Superior Court, York County, that declares invalid an agreement between the Association and the Inn concerning certain common areas belonging to the condominium owners of Stage Neck Colony (Colony). The Superior Court accepted the conclusion of a referee that 33 M.R.S.A. § 565(2) required the unanimous consent of all condominium owners prior to execution of the agreement. Because the court erred in its application of section 565(2), we vacate the judgment and remand this case to the Superior Court without reaching other issues raised by the parties.

## I.

Marshall N. Jarvis, II, and twelve other plaintiffs are condominium unit owners in the Colony, a condominium development in York Harbor. The Association includes all unit owners in the Colony. Stage Neck, Inc. (developer) is the developer of the Colony. The Inn operates a resort hotel adjacent to the condominiums.

In 1973, the Inn obtained a twenty-year lease, subject to earlier cancellation, from the developer for the use of the tennis courts, swimming pool, parking lot, and other equipment located in what is now the common areas of the Colony. Access for the Inn to these facilities was considered necessary to the Inn's status as a "resort hotel." The developer assigned these leases to the Association in 1974, when the Association was created.

In 1975, the developer and the Inn began negotiations for a long-term agreement involving the facilities covered in the 1973 lease. In late 1975, the Inn and the developer reached a tentative agreement for a long-term lease of the facilities. The Inn, the developer and the Association were, however, unable to reach a final agreement. Negotiations continued through 1976. Late that year, the Association rejected the lease proposal. In 1977, the Association voted to terminate the 1973 lease. Soon after, the Inn sued the Association and the developer for failure to deliver the lease agreed to by the developer.

The condition of the facilities deteriorated during the next few years. The Association had neither the staff nor the resources to manage the facilities. A proposal to have the pool and tennis courts maintained by the Association was, in fact, overwhelmingly defeated by a vote of the unit owners. The pool and tennis courts remained closed throughout the 1979 summer season.

In light of the pending litigation, the poor condition of the facilities and the belief of many Association members that outside management of the facilities was desirable, negotiations among the Association, the developer, and the Inn continued in an attempt to reach some type of management

agreement. Eventually, Agreement I,[1] in dispute in this appeal, was proposed. In October, 1979, the Association voted to accept Agreement I, with 80.25% of the unit ownership in favor of the agreement. In January, 1980, the Association's Board of Directors unanimously approved Agreement I and the Agreement was executed. As provided in the Agreement, the 1977 Inn-developer-Association litigation was dismissed.

Agreement I provides essentially for shared use by the Inn and Colony unit owners of the tennis courts, swimming pool, and parking areas of the Colony for a twenty-five year period. The Inn operates the pool and courts throughout the summer season. Membership in, and use of, the facilities is limited to Inn guests, unit owners, and a limited number of outside persons. Membership fees are retained by the Inn. The Inn also may operate food and beverage services or "other programs." Receipts from such operations are also kept by the Inn. The Inn pays a use fee, all real estate taxes and insurance for the land and facilities covered by the agreement, and is responsible for repairs and capital improvements. Aside from the Association's Pool and Tennis Committee, which works with Inn representatives to coordinate pool and tennis operations, management is generally left to the Inn. The Association may cancel the agreement under specified conditions.

The plaintiffs filed their complaints in February, 1980. Their complaint, amended to join necessary parties, alleged (1) that the agreements were invalid under the Maine Unit Ownership Act, 33 M.R.S.A. §§ 560–587 (1978); (2) a conflict of interest on the part of the developer as a unit owner; (3) a conflict of interest on the part of the developer as a director in the Association; (4) a breach of fiduciary duty by the developer to the unit owners; (5) that unauthorized proxy voting was used to approve Agreement II and III and to remove three directors prior to the Board of Directors' voting on the agreements. Plaintiffs sought a declaration that the agreements were void, preliminary and permanent injunctive relief against performance of the agreements, and costs. The parties agreed to submit the dispute to a referee.

The referee found that Agreements I, II, and III were invalid. Reading 33 M.R.S.A. § 565(2)[2] and paragraph 9(11) of the Colony Condominium Declaration[3] together, the referee concluded that absent unanimous consent of the unit owners, control of the common elements of the Colony could not be placed in the hands of a third party. The referee found that the agreements worked a "diminution and impairment of the undivided interests in the common elements owned by the unit owners, particularly as they affected control." Because Agreement I impaired the interests of the owners, the referee found the Agreement

1. Agreement II, concerning the Inn's use of Gallows Point, and Agreement III, concerning the Inn's use of a vacant sewer treatment plant, were also approved by the Association. Because appellants explicitly present no argument with respect to Agreements II and III, we do not deal with these agreements in our consideration of this appeal.

2. Section 565(2) provides:
   **2. Permanent character.** The percentage of the undivided interest of each unit owner in the common areas and facilities as expressed in the declaration shall have a permanent character and shall not be altered without the consent of all of the unit owners expressed in an amended declaration duly recorded. The percentage of the undivided interest in the common areas and facilities

shall not be separated from the unit to which it appertains and shall be deemed to be conveyed or encumbered with the unit even though such interest is not expressly mentioned or described in the conveyance or other instrument.

3. Paragraph 9(11) provides:
   11) All provisions of the Unit Ownership Act, this declaration, the bylaws of The Stage Neck Owners Association, and the deeds to individual units are designed to prevent unreasonable interference with the use of the respective units and of the common areas and facilities by the several unit owners, and shall be construed to be covenants running with the land and with every part thereof and interest therein including but not limited to every unit and the appurtenances thereto.

invalid even if viewed as a settlement or a management agreement. The referee did not address plaintiffs' allegations concerning conflict of interest, breach of fiduciary duty, or proxy voting.

The defendants filed objections to the referee's report and a motion for amendment and additional findings by the referee. This motion and the motion for action upon the objections were denied. The plaintiffs did not object to any part of the report and moved for its acceptance. The court accepted the report and entered judgment accordingly, declaring that the three agreements were invalid. The defendants were permanently enjoined from acting pursuant to the agreements and were ordered to pay plaintiffs' costs of $1147.81. Defendants' timely appeal followed; plaintiffs have filed no cross-appeal. The judgment of the Superior Court was stayed pending a final decision from the Court.

## II.

Under the Association bylaws, the Board of Directors may enter into management agreements for the administration of the Colony common areas and facilities. The Colony Declaration provides that the Board may not, in the exercise of that authority, take any action that unreasonably interferes with the unit owners' use of the respective units, the common areas, and the facilities. The affirmative vote of a majority of a quorum of owners is generally sufficient to approve such agreements. A quorum is comprised of owners of more than 50% of the aggregate interest in common areas and facilities. All action by the Board of Directors is subject to the provision in the Colony Declaration that the owners' use of the common areas and facilities may not be interfered with unreasonably.

Through Agreement I, the Board of Directors clearly has delegated to the Inn the Board's responsibility for managing the Colony common areas and facilities. The question presented,[4] therefore, is whether the agreement alters the owners' percentage interest in the common areas, requiring the owners' unanimous consent under section 565(2).

Article II, section 6 of the Association bylaws provides that a majority vote by owners of more than fifty percent of the total interest in the common areas and facilities shall decide *any* question, except the election of Directors, "unless a greater percentage vote is required by law, by the Declaration or by these Bylaws." Neither the Declaration nor the bylaws require a greater than majority vote to approve

---

**4.** Throughout this dispute, the parties have focused on whether Agreement I is a lease. Authority from other jurisdictions provides that a lease of a condominium's common area approved by less than a unanimous vote of the unit owners is a taking of property. *Makeever v. Lyle*, 125 Ariz. 384, 388–89, 609 P.2d 1084, 1088–89 (App.1980) (approval by ten of sixteen unit owners to convert common general elements to exclusive and private use and control of one owner held invalid). Such a taking, the parties conclude, would clearly alter each owner's percentage interest in those areas and would violate § 565(2). Because all parties have concluded that Agreement I is invalid if it is a lease, they debate whether a lease requires allegation of *exclusive* possession and control.

The parties also focus on the wording of Agreement I. Terms such as "lease," "let," and "rent" were omitted from Agreement I, except in Art. V, where the term "lease" inadvertently appears. Counsel for defendants advised against any use of the term "lease" in discussing Agreement I. At oral argument, counsel for defendants conceded that in drafting the agreement, he had tried to produce a document as close to a lease as possible but one which would pass muster.

Plaintiffs nevertheless emphasize the use of the term "lease" by all parties during testimony. Plaintiffs further argue that the parties intended to enter a lease agreement and that that intent should control the Court's conclusion with regard to the nature of the document. Although refusing to label the instruments, the referee concluded that the agreements gave to the Inn elements of control "ordinarily enjoyed by a lessee" and retained for the owners "only those privileges which might appropriately be conferred by a license."

We think the semantical approach achieves little in terms of reasoned analysis. We prefer to focus upon the rights conferred and the functions contemplated by the parties.

agreements entered by the Board on behalf of the Association.

Section 565(2) of the Unit Ownership Act [5] states that the percentage of the undivided interest of each unit owner in the common areas and facilities may not be altered without the owners' unanimous consent. That section concerns the relationship among the owners with regard to percentage ownership of the common areas.[6] For example, under a condominium declaration provision similar to the unanimity requirement of section 565, a lease to certain unit owners of space in the common areas was held invalid absent unanimous owner approval. *Stuewe v. Lauletta,* 93 Ill.App.3d 1029, 1032, 49 Ill.Dec. 494, 497, 418 N.E.2d 138, 141 (1981). In *Stuewe,* ownership of the common elements was diminished vis-à-vis all owners except the lessees, whose ownership was increased.

Similarly, in *Makeever v. Lyle,* 125 Ariz. 384, 609 P.2d 1084 (1980), one unit owner had been permitted, by majority vote of the unit owners, to build a second story on his condominium. The nonconsenting owners challenged the contemplated construction as "a wrongful appropriation or taking for [the owner's] sole and exclusive use and control of cubic space belonging in common to all the apartment owners...." Although Arizona had no statutory provision similar to Maine's section 565, the court concluded that the conversion of a portion of the general common elements to one individual's exclusive and private use, control and ownership was invalid without unanimous consent. 125 Ariz. at 388–89, 609 P.2d at 1088–89; *see also Grimes v. Moreland,* 41 Ohio Misc. 69, 74, 322 N.E.2d 699, 703 (1974) (owner's placement of fences and air conditioner compressors on common areas was a taking of common area property affecting other owners' percentage of undivided interest unless unanimously ap-

proved); *Parrillo v. 1300 Lake Shore Drive Condominium,* 103 Ill.App.3d 810, 812, 59 Ill.Dec. 464, 466, 431 N.E.2d 1221, 1223 (1981) (owner's construction in common area to which he held exclusive use easement did not affect other owners' percentage of ownership in common areas).

■ There is a distinct difference between these cases, in which exclusive use, control, and/or ownership of the common areas is taken from some or all of the unit owners and cases in which some reasonable restrictions or regulation of the common areas is imposed on all owners. In the first instance, each owner's percentage interest in the common area is altered. In the second instance, the percentage ownership interest is unaffected. As noted in *Makeever,* "it is a great step from a delegation of the right to manage one's interest in the general common elements for common purposes to a grant of the right to dispose of that property interest completely for the sole, exclusive and private use of another." 125 Ariz. at 389, 609 P.2d at 1089. The cases that consider only the *regulation* of the various aspects of condominium living, including the common areas, generally hold that if such regulations are "reasonable, consistent with the law, and enacted in accordance with the bylaws, then they will be enforced." *Dulaney Towers Maintenance Corp. v. O'Brey,* 46 Md.App. 464, 466, 418 A.2d 1233, 1235 (1980); *see Juno By the Sea North Condominium Association v. Manfredonia,* 397 So.2d 297, 298 (Fla.App. 1981); *Hidden Harbor Estates, Inc. v. Norman,* 309 So.2d 180, 182 (Fla.App.1975).

The distinction is well illustrated by *Juno.* The Board of Directors in *Juno* assigned individual parking spaces in a common area to some, but not all, unit owners. The court found the assignment invalid and reasoned:

5. See *supra* note 2.

6. We do not address whether an increase or decrease in all owners' undivided interest would require unanimous consent. *See Tower House Condominium, Inc. v. Millman,* 410 So.2d 926, 930 (Fla.App.1981) ("An undivided

interest is an undivided interest in the whole and when that whole changes, that interest, if not the percent, also changes"; acquisition of $400,000 piece of property was material alteration of common area and of owners' interest).

Parking is no doubt an essential part of living in a condominium community. If there were sufficient parking spaces in Lot B, a common element, to furnish a parking space for each unit owner, the Board could, pursuant to its rule making power, assign parking spaces. And certainly the Board can set out reasonable rules and regulations concerning the size of the spaces, speed limits in the parking lot and other rules necessary to maintain order and safety in the area. But the evil involved in the present case is that Lot B is not large enough to afford a parking space for all seventy unit owners and so the Board has chosen some unit owners, but not all, for this preferential assignment.

397 So.2d at 298.

■ Based on a reading of Agreement I and on the evidence presented at the hearing, Agreement I is clearly an agreement for the management of the Colony's common areas. The Agreement does not increase or diminish the common areas; it does not relegate any portion of the common areas to the exclusive use of one or some of the unit owners. Further, the agreement does not permit any exclusive use by the Inn.[7] The Agreement, therefore, in no way affects the percentage of the undivided interest of each unit owner in the common areas and facilities relative to the interest of any other owner. Each owner's percentage interest has retained its "permanent character," as it must under section 565(2) unless altered by consent of all of the owners. It was error to hold Agreement I invalid; unanimous approval was not required under section 565(2).

Plaintiffs raise in their brief additional issues concerning the validity of Agreement I, including the question whether Agreement I is a reasonable exercise of the Association's authority under the Colony declaration and bylaws. Because those issues

were not addressed by the referee, we conclude that they are not appropriately before this Court and we decline to comment thereon.

The entry is:

Judgment vacated.

Case remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.

---

**7.** The regulation of food concessions and other programs, such as swimming lessons, is but a reasonable restriction for the benefit of all. Furthermore, we were advised at oral argument that the Inn does not collect membership fees from condominium owners; thus, one arguable interference with the owners' use is eliminated.