681 A.2d 494

## The RIDGELY CONDOMINIUM ASSOCIATION, INC.

v.

## Nicholas SMYRNIOUDIS, Jr. et al.

No. 120, Sept. Term, 1995.

Court of Appeals of Maryland.

Aug. 27, 1996.

S. Leonard Rottman (Adelberg, Rudow, Dorf, Hendler & Sameth, LLC, on brief), Baltimore, for Petitioner.

Jonathan E. Claiborne (Whiteford, Taylor & Preston, L.L.P., on brief), Towson, for Respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case involves a judgment enjoining the Ridgely Condominium Association, Inc. (Association) from enforcing a bylaw amendment which prohibited clients of the condominium's seven first-floor commercial unit owners from entering and leaving the commercial units via the condominium lobby.

I

A condominium is a "communal form of estate in property consisting of individually owned units which are supported by collectively held facilities and areas." *Andrews v. City of Greenbelt*, 293 Md. 69, 71, 441 A.2d 1064 (1982).

The term condominium may be defined generally as a system for providing separate ownership of individual units in multiple-unit developments. In addition to the interest acquired in a particular apartment, each unit owner also is a tenant in common in the underlying fee and in the spaces and building parts used in common by all the unit owners.

4B Richard R. Powell, *Powell on Real Property* ¶ 632.1[4] (1996). A condominium owner, therefore, holds a hybrid

property interest consisting of an exclusive ownership of a particular unit or apartment and a tenancy in common with the other co-owners in the common elements.[1] *Andrews, supra*, 293 Md. at 73–74, 441 A.2d 1064; *see also Starfish Condo. v. Yorkridge Serv.*, 295 Md. 693, 703, 458 A.2d 805 (1983); *Black's Law Dictionary* 295 (6th ed. 1990).

In exchange for the benefits of owning property in common, condominium owners agree to be bound by rules[2] governing the administration, maintenance, and use of the property. *Andrews, supra*, 293 Md. at 73, 441 A.2d 1064. Upholding a rule prohibiting the consumption of alcohol in a condominium's clubhouse, a Florida court observed:

> It appears to us that inherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization.

*Hidden Harbour Estates, Inc. v. Norman*, 309 So.2d 180, 181–82 (Fla.Dist.Ct.App.1975); *see also Nahrstedt v. Lakeside Village Condo.*, 8 Cal.4th 361, 33 Cal.Rptr.2d 63, 878 P.2d 1275, 1281 (1994) ("Use restrictions are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrange-

---

1. The Maryland Condominium Act defines "common elements" as all of the condominium except for the units. "Limited common elements" are those which are "reserved for the exclusive use of one or more but less than all of the unit owners." "General common elements" are those which are not limited. Maryland Code (1996 Repl.Vol.) § 11–101 of the Real Property Article.

2. The term "rule" is used in this opinion in its generic sense to encompass any regulation in any form enacted by a condominium board of directors or council of unit owners, or contained in the condominium's original documents.

ment."); *Dulaney Towers v. O'Brey,* 46 Md.App. 464, 466, 418 A.2d 1233 (1980) ("The courts stress that communal living requires that fair consideration must be given to the rights and privileges of all owners and occupants of the condominium so as to provide a harmonious residential atmosphere.").

The Maryland Condominium Act (the Act), Maryland Code (1996 Repl.Vol.) §§ 11–101 et seq. of the Real Property Article, regulates the formation, management, and termination of condominiums in Maryland. The Act was originally enacted by Ch. 387 of the Acts of 1963, as the Horizontal Property Act[3] in response to § 104 of the Federal Housing Act of 1961, Pub.L. No. 87–70, 75 Stat. 149, which made federal mortgage insurance available to condominiums in states where title and ownership were established for such units. The Act was based on the Federal Housing Administration's Model Horizontal Property Act of 1961. 66 Op.Atty.Gen. 50, 52 (1981). The legislature amended and recodified the Act by Ch. 641 of the Acts of 1974.[4]

Under the Act, property becomes a condominium upon the recording of a declaration, bylaws, and a condominium plat. § 11–102. The declaration must include the name of the condominium; a description of the entire project, the units, and the common elements; and the percentage interests in the common elements and votes appurtenant to each unit. § 11–103(a). The declaration may be amended with the written consent of at least 80% of the unit owners, except that unanimous consent of the owners is required for some amendments, such as altering percentage interests in common ele-

---

**3.** "The concept of 'horizontal property' or 'strata' ownership simply means that the area above land can be divided into a series of strata or planes capable of severed ownership, making the ownership of things affixed to land separable from the ownership of the land itself." *Nahrstedt, supra,* 33 Cal.Rptr.2d 63, 878 P.2d at 1280.

**4.** The Condominium Revision Committee of the Real Property, Planning and Zoning Section of the Maryland State Bar Association proposed the revisions to the General Assembly in a report which is reprinted in the editor's note before Title 11 of the 1978 Cumulative Supplement to the Real Property Article. *See Rockville Grosvenor, Inc. v. Mont. Co.,* 289 Md. 74, 85–86, 422 A.2d 353 (1980).

ments, changing the use of units from residential to nonresidential and vice versa, and redesignating general common elements as limited common elements. §§ 11–103(b); 11–107(c).

The bylaws govern the administration of the condominium and must include the form of the condominium administration and its powers, meeting procedures, and fee collection procedures. § 11–104(a), (b).  The former § 11–111(f) also required the bylaws to include restrictions on the use of units and common elements.[5]  The 1974 amendments made inclusion of such use restrictions in the bylaws optional.  Section 11–104(c) now provides: "The bylaws may also contain any other provision regarding the management and operation of the condominium including any restriction on or requirement respecting the use and maintenance of the units and the common elements."  The bylaws may be amended by at least a 2/3 vote of the unit owners. § 11–104(e)(2).

The Council of Unit Owners, which may delegate its powers to a Board of Directors, governs the affairs of the condominium and may adopt rules for the condominium. §§ 11–109(a),(b), 111(a).  If there is any conflict between the provisions of the various documents governing the condominium, the statute controls, then the declaration, plat, bylaws, and rules in that order. § 11–124(e).

## II

The Ridgely, located at 205 East Joppa Road in Towson, Maryland, was established in June, 1975.  According to Article XV, § 1 of the Association's bylaws, all of the 239 units in the building are residential, except for the seven units on the first floor which "may be used as professional offices."  Each of the

---

5.  Maryland Code (1974) § 11–111(f) of the Real Property Article provided: "The bylaws must necessarily provide for at least the following: ... (f) Such restrictions on or requirements respecting the use and maintenance of the units and the use of the common elements as are designed to prevent unreasonable interference with the use of the respective units and of the common elements by the several unit owners."

seven commercial units is accessible both through the lobby and directly through a door located outside of the building. There are no porches or canopies protecting the exterior entrances to the commercial units.

The accounting firm of Smyrnioudis & Wilhelm occupies unit 102. Nicholas Smyrnioudis, Jr. and his father, Nicholas Smyrnioudis, Sr., have owned the unit since 1977. Clients entered the office through both the lobby and outside exterior doors until the office was remodeled in 1987 at a cost of approximately $40,000. The exterior door now opens into a conference room. Nicholas Smyrnioudis, Jr. testified that switching the reception area and conference room would involve removing an eleven foot reception counter, non-bearing walls, and carpeting.

Mary Granger operated a mail list brokerage and management company in unit 104, which she purchased in 1985. The three or four clients who visited each month used both the lobby and exterior doors. During the pendency of this litigation, Granger sold her unit to Philip R. Grillo, who also operates a business in the unit. Visitors to all of the other commercial units use the exterior doors exclusively.

In 1990, the Association remodeled the lobby of the Ridgely at a cost of approximately $125,000. The lobby, which is among the condominium's common elements, is elaborately decorated with marble floors, dark wood-paneled walls and decorative furniture. The cost of the remodeling was paid out of condominium fees to which both the commercial and residential tenants contribute. Nicholas Smyrnioudis, Jr. testified that use of the lobby is important for his business because of its appearance and because it allows clients to avoid wet grass, ice, rain, and snow. Mary Granger also testified that the lobby "lends to our credibility as a professional business" and "makes a nice impression." In addition, she testified that using the exterior door in the winter makes it difficult to keep the office warm.

The president of the Association, Calvin Coblentz, testified that members of the Association had become concerned about

security around the time the lobby was renovated. A card system was installed for the garage doors and elevators in the garage, fire exits were made inaccessible from outside the building, and lighting was added in the parking areas.[6]

In May of 1990, the Board of Directors, in response to members' security concerns, sought to have the commercial unit owners voluntarily agree to have visitors use the exterior entrances to their units exclusively. When this effort failed to achieve full compliance, the Board of Directors, in the spring of 1991, adopted a resolution which provided that: "Effective September 1, 1991, clients of commercial units owners and tenants shall not utilize the Condominium's lobbies."

On August 27, 1991, (1) Nicholas Smyrnioudis, Jr., Sr. and George Wilhelm; (2) Merrill I. Berman and Joseph B. Francus; and (3) Mary E. Granger (appellees) filed suit in the Circuit Court for Baltimore County against the Association seeking to enjoin the enactment or enforcement of rules restricting the use of the lobby by the appellees' clients.[7]

On or about October 1, 1991, the members of the Association voted to amend the bylaws. Originally, Article XV, § 1 of the bylaws provided: "All units shall be used as a single family residence, except that up to a maximum of seven (7) units on the first floor may be used as professional offices." The amendment added:

provided however, that all clients of, or visitors to, professional office owners or their tenants shall be required to use the exterior entrances of each such professional office for ingress and egress.

---

6. Officer John S. Reginaldi, Crime Prevention Coordinator for the Towson precinct of the Baltimore County Police Department testified at the trial that the Ridgely "is relatively safe other than the fact of the commercial businesses using the main entrances." To improve security, he recommended that the commercial units use the exterior entrances.

7. Appellees' counsel has stricken his appearance for Berman and Francus since they sold their unit after the trial. Granger sold her unit, after the Court of Special Appeals issued its opinion, to Philip R. Grillo who requested that he be substituted as a party in this appeal.

> No visitor or clients of any owner of a professional office or tenant thereof, shall be permitted in any other area of the building, unless accompanied by the owner of the office unit or the tenant of such office unit. For the purpose of this section, the terms "clients" or "visitor" of professional office owner or tenant, shall include the clients or visitor and all person(s) who may accompany such client or visitor to such professional office.

The appellees do not challenge the procedures used to adopt the resolution or amend the bylaws.

The appellees filed an amended complaint on September 27, 1991. Pending trial, the parties reached an agreement which allowed commercial visitors to use the lobby, but required them to sign in and wait at the front desk for an escort.

After a trial, Judge John F. Fader, II, on April 18, 1994, enjoined the Association from enforcing the bylaw. In his opinion, Judge Fader determined that "the proper standard of review is whether the Condominium's rule is reasonable." The restriction, he said, "is unenforceable for failure to reasonably relate to the health, happiness and enjoyment of unit owners." Safety concerns, he noted, had prompted the adoption of the restriction, but there was no evidence that any commercial visitors had threatened the building's security. Judge Fader added:

> There was no indication that the prohibition of all access by commercial tenants and their clients/patients was the only method, the least intrusive method, or the best means available to lessen the possibility of unauthorized persons entering the building, or of authorized individuals causing trouble. In prohibiting commercial access via the main lobby, the Board reacted to a situation, which objectively was not dire, and which did not require the stringent regulation initiated by the Board.

Judge Fader also held that the restriction "fails the reasonableness test since it has a discriminatory impact on commercial unit owners."

On appeal, the Court of Special Appeals affirmed. *Ridgely Condo. v. Smyrnioudis,* 105 Md.App. 404, 660 A.2d 942 (1995). At the outset, it said that "our review of the record convinces us that this case actually concerns an access restriction that has diluted appellees' respective percentage interests in the Condominium lobby." *Id.* at 409, 660 A.2d 942. In a footnote, the court said that, "To deny the use of the lobby to clients of the commercial unit owners constitutes an *ultra vires* taking of a portion of their percentage interest in the common areas in derogation of the Ridgely Condominium declaration as well as certain provisions of the Maryland Condominium Act." *Id.* at 409 n. 2, 660 A.2d 942. Nonetheless, the court declined to base its decision on that issue since it was not argued by the parties in the circuit court. *Id.* at 410, 660 A.2d 942.

The court held that the reasonableness test is the proper standard of review for evaluating restrictions contained in a bylaw amendment. *Id.* at 422, 660 A.2d 942. Courts apply a more deferential standard of review to recorded use restrictions, the court said, because unit owners have notice of the restrictions when they purchase their units. *Id.* at 417, 660 A.2d 942. In contrast, the court concluded that the more restrictive reasonableness standard is appropriate in this case, because owners did not have notice of the restriction when they purchased their units. *Id.* at 418, 660 A.2d 942.

The court emphasized the disparate impact of the restriction on the commercial unit owners, *id.* at 421, 660 A.2d 942, and indicated that § 11–108 may require any use restriction that does not apply equally to all unit owners to be stated in the declaration. *Id.* at 420, 660 A.2d 942. Thus, the court held that application of a deferential standard of review is particularly inappropriate where the use restriction has a discriminatory impact. *Id.* at 421, 422, 660 A.2d 942.

### III

The Association filed a petition for a Writ of Certiorari, which we granted, and which presented this question: "Did the trial court and the Court of Special Appeals apply the

appropriate standard of review for evaluating the propriety of a condominium by-law amendment?" In their brief and before the lower courts, the appellees argued that courts should apply a reasonableness test in reviewing the validity of condominium bylaw amendments. At oral argument before us, however, they argued in addition that the bylaw amendment at issue violated both the declaration and the Act by "taking" a property right. Such changes in property interests, they maintained, may only be accomplished by amending the declaration with the unanimous consent of the unit owners. Although this point was not briefed by the parties and was only briefly alluded to in the opinion of the Court of Special Appeals, the appellees urge this Court to reach the issue.

Under Rule 8–131(b), we "ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals." Appellees' argument is directly responsive to the question in the petition for certiorari. They assert that the test for evaluating the propriety of the by-law amendment is whether it deprives a unit owner of a property right. Consequently, in our view, the argument is encompassed within the question presented in the certiorari petition.

### IV

In reviewing the validity of a rule, a court must determine whether the Board of Directors or Council of Unit Owners had the authority to promulgate the rule at issue under the Act, declaration, and bylaws. *Dulaney Towers, supra,* 46 Md.App. at 466, 418 A.2d 1233; *Johnson v. Hobson,* 505 A.2d 1313, 1317 (D.C.App.1986); *Juno by the Sea North Condominium v. Manfredonia,* 397 So.2d 297 (Fla.Dist.Ct. App.1981); 68 Op.Atty.Gen. 112, 119 (1983). Since we find that the Association did not have the authority to enact the rule at issue here by amending the bylaws, we do not reach the question briefed by the parties.

The Association contends that the rule is merely a use restriction which the Council of Unit Owners may enact by

amending the bylaws with a 2/3 vote of the unit owners.[8] Cases addressing the propriety of use restrictions fall generally into two categories. In the first class of cases, which we will refer to as "exclusive use" cases, some courts rule that granting *exclusive* use of common elements to one or few unit owners changes the percentage interest of the excluded unit owners in the common elements. *E.g., Kaplan v. Boudreaux,* 410 Mass. 435, 573 N.E.2d 495 (1991). In the second class of cases, which we will refer to as "equality" cases, some courts rule that if a restriction applies equally to all the unit owners, it does not change their respective percentage interests in the common elements. *E.g., Jarvis v. Stage Neck Owners Ass'n,* 464 A.2d 952 (Me.1983).

The Supreme Judicial Court of Massachusetts, in *Kaplan, supra,* 573 N.E.2d at 497, reviewed a bylaw amendment granting exclusive use of a path, which was part of the condominium's common elements, to one unit. The statute required consent of all the unit owners to alter the percentage interests in the common elements. *Id.* The court found that it was not necessary to "transfer ... the sum total of a unit owner's interests in a portion of the common area" in order to "affect [the] percentage interest in the common area." Rather, "[t]ransfer of an interest that is smaller than an 'ownership' interest would suffice to alter the percentage interest held by each [owner]." *Id.* 573 N.E.2d at 498–99. The court held that the amendment affected an interest in land because it resembled an easement and concluded that the amendment changed the relative percentage interests of the unit owners in the common elements. Therefore, consent of all the unit owners was required to enact the amendment. *Id.* at 500; *see also Makeever v. Lyle,* 125 Ariz. 384, 609 P.2d 1084, 1089 (Ariz.Ct.App.1980) (converting general common elements to exclusive use of one owner constitutes taking of other owners' property without authority); *Preston v. Bass,* 13 Ark.App. 94, 680 S.W.2d 115, 116 (1984) (Board approval of carport in

---

**8.** The Ridgely bylaws, Article XXI, § 1, require a vote of 75% of the unit owners to amend the bylaws.

common area created limited common element requiring 100% vote of unit owners); *Penney v. Association of Apt. Owners*, 70 Haw. 469, 776 P.2d 393, 395 (1989) (change from general to limited common element altered unit owners' percentage interests); *Carney v. Donley*, 261 Ill.App.3d 1002, 199 Ill.Dec. 219, 224, 633 N.E.2d 1015, 1020 (1994) (board did not have authority to approve balcony extensions into common area); *Sawko v. Dominion Plaza One Condo. Ass'n*, 218 Ill.App.3d 521, 161 Ill.Dec. 263, 269, 578 N.E.2d 621, 627 (1991) (assigning parking spaces to some units diminished other owners' interests in common elements); *Stuewe v. Lauletta*, 93 Ill. App.3d 1029, 49 Ill.Dec. 494, 496, 418 N.E.2d 138, 140 (1981) (developer's grant of parking space to one unit gave exclusive easement and diminished other owners' interests in common elements); *Strauss v. Oyster River Condominium Trust*, 417 Mass. 442, 631 N.E.2d 979, 981 (1994) (additions built in common area changed percentage interests of unit owners); *Grimes v. Moreland*, 41 Ohio Misc. 69, 322 N.E.2d 699, 702 (1974) ("placing fences and [air conditioner] compressors on condominium common areas constitutes a taking of property and an ouster of co-tenants from common areas"); *cf. Alpert v. Le'Lisa Condominium*, 107 Md.App. 239, 247, 667 A.2d 947 (1995) (parking spaces assigned to 20 of 32 unit owners did not become limited common elements because they would not be conveyed with the unit); *Juno by the Sea, supra*, 397 So.2d 297, 303 (assigning parking spaces to 50 of 70 unit owners did not convert general into limited common elements because spaces would not be conveyed with the unit). *Compare Parrillo v. 1300 Lake Shore Drive Condo.*, 103 Ill.App.3d 810, 59 Ill.Dec. 464, 466, 431 N.E.2d 1221, 1223 (1981) (enclosing limited common element would not change unit owners' percentage interests in common elements because use was already exclusive) *with Gaffny v. Reid*, 628 A.2d 155, 157 (Me.1993) (cottage encroaching on limited common area violated other owners' property rights despite prior exclusivity of use).

In contrast, the Supreme Judicial Court of Maine, in *Jarvis, supra*, 464 A.2d at 954, reviewed an agreement approved by

80% of the unit owners which granted an adjacent resort hotel use of the condominium's pool, tennis courts, and parking area. The court discussed *Stuewe, supra,* 93 Ill.App.3d 1029, 49 Ill.Dec. 494, 418 N.E.2d 138, and *Makeever, supra,* 125 Ariz. 384, 609 P.2d 1084, and said:

> There is a distinct difference between these cases, in which exclusive use, control and/or ownership of the common areas is taken from some or all of the unit owners and cases in which some reasonable restrictions or regulation of the common areas is imposed on all owners. In the first instance, each owner's percentage interest in the common area is altered. In the second instance, the percentage ownership interest is unaffected.

*Jarvis, supra,* 464 A.2d at 956. Since the agreement did not increase or decrease the common elements and did not grant any owner exclusive use, it did not alter the percentage interests of the unit owners. *Id.* at 957; *see also Schaumburg State Bank v. Bank of Wheaton,* 197 Ill.App.3d 713, 144 Ill.Dec. 151, 555 N.E.2d 48, 52–53, *cert. denied,* 133 Ill.2d 573, 149 Ill.Dec. 337, 561 N.E.2d 707 (1990) (declaration amendment granting nonexclusive easement over driveway to neighbor did not change unit owners' percentage interests in common element); *Bd. of Dir. of By the Sea Council v. Sondock,* 644 S.W.2d 774, 781 (Tex.App.–Corpus Christi 1982) (declaration amendment allowing removal of carports did not change unit owners' percentage interests in common element because applied equally to all unit owners); *cf. Coventry Square Condominium Ass'n v. Halpern,* 181 N.J.Super. 93, 436 A.2d 580, 582 (1981) (bylaw amendment requiring security deposit from rented units only created "a special class of owners" and was unreasonable, arbitrary, and unnecessary).

Here, the rule at issue affected an "interest" in property. The bylaw amendment revoked the commercial unit owners' right to have their clients use the lobby. That right resembles an easement, which is an interest in property. In *Condry v. Laurie,* 184 Md. 317, 320, 41 A.2d 66 (1945), we discussed the difference between a license and an easement:

While an easement implies an interest in land, a license is merely a personal privilege to do some particular act or series of acts on land without possessing any estate or interest therein. In *De Haro v. United States,* 5 Wall. 599, 627, 18 L.Ed. 681, 688, Justice Davis spoke of the incidents of a license as follows: "It is an authority to do a lawful act, which, without it, would be unlawful, and while it remains unrevoked is a justification for the acts which it authorizes to be done. It ceases with the death of either party, and cannot be transferred or alienated by the licensee, because it is a personal matter, and is limited to the original parties to it."

The right which the bylaw amendment revoked was not "a mere personal privilege," *Griffith v. Montgomery County,* 57 Md.App. 472, 485, 470 A.2d 840 (1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985), but was appurtenant to the condominium unit and would be conveyed with the unit. Since the right resembles an easement, we hold that the bylaw amendment affected an interest in the appellees' property. *See Kaplan, supra,* 573 N.E.2d at 500.

Here, however, and unlike the exclusive use cases, such as *Kaplan, supra,* 410 Mass. 435, 573 N.E.2d 495, the bylaw amendment did not grant one or few unit owners exclusive use of a common area. Nonetheless, unlike the equality cases, such as *Jarvis, supra,* 464 A.2d 952, the bylaw amendment disparately affected a portion of the unit owners by revoking a property interest they acquired when they purchased their units, without affecting the rights of the other unit owners.

In terms of the Maryland Condominium Act the lobby was a general common element, the use of which all of the tenants enjoyed equally. This was consistent with § 11–108(a) requiring that, "except as provided in the declaration, the common elements shall be subject to mutual rights of ... access, use, and enjoyment by all unit owners." By by-law amendment, the Association has attempted to deny that mutuality of use of a general common element. Further, under § 11–106(a), "[e]ach unit in a condominium has all of the incidents of real property." By by-law amendment, the Association has at-

tempted to reduce the "easement" that the professional office units enjoyed in the lobby, and that "easement" is one of the incidents of the ownership of a professional office unit.

For these reasons, we hold that it was beyond the power of the Association by by-law amendment to purport to deprive the owners of the professional office units of their rights under the declaration and under the Maryland Condominium Act to the enjoyment of the lobby for the ingress and egress of their business invitees.

*JUDGMENT AFFIRMED WITH COSTS.*