Dear Honorable Jean W. Roesser
You have requested our opinion concerning a proposed continuing care retirement community ("CCRC") project that would be structured as a residential condominium within a master condominium. Section 11-133 of the Real Property Article ("RP") of the Annotated Code of Maryland allows a council of unit owners of a residential condominium to terminate agreements entered into by the developer of the condominium, if the council acts during the three-year period after unit owners gain control of the condominium. You note that, under the proposed structure, the CCRC residents would control only the residential condominium and that entities related to the developer could permanently control the council of unit owners of the master condominium and therefore key leases, management contracts, and other contracts related to the CCRC project. You ask whether the condominium-within-a-condominium structure would violate RP § 11-133.
In our opinion, the proposed structure, as described in your letter, does not violate RP § 11-133. However, your concern is not without some justification, and the structure would affect the nature and extent of disclosure required as a prerequisite to the sale of residential units in the CCRC.
 I Background
A. Condominiums
A condominium is a "communal form of estate in property consisting of individually owned units which are supported by collectively held facilities and areas." Andrews v. City of Greenbelt,293 Md. 69, 71, 441 A.2d 1064 (1982). A condominium unit owner thus has a hybrid property interest consisting of exclusive ownership of a unit and tenancy in common in the common elements.[1] Ridgely Condominium Ass'n, Inc. v. Smyrnioudis, 343 Md. 357, 358-59,681 A.2d 494 (1996). "In exchange for the benefits of owning property in common, condominium owners agree to be bound by rules governing the administration, maintenance, and use of the property." Id. at 359 (footnote omitted).
The Maryland Condominium Act establishes ground rules for the creation, initial sale, management, and termination of condominium regimes. See RP § 11-101 et seq. The Act also provides for a hierarchy of legal instruments and regulations to govern a particular condominium regime, including a condominium declaration, plat, bylaws, and rules. See RP § 11-124(c)-(e) (principles for construing various legal instruments and rules governing condominium). A condominium is governed by a council of unit owners comprised of all unit owners, which may delegate its powers to a board of directors or managing agent. RP § 11-109.
The Maryland Condominium Act requires registration of a public offering statement that fully discloses certain aspects of a residential condominium before the initial sale of a unit. RP §§ 11-126,11-127. The law also requires that a seller make specified disclosures as a condition of the resale of a residential unit. RP § 11-135. In addition to the disclosure requirements, the Act contains certain other protections for unit owners. For example, the Act regulates the creation and election of a board of directors by a council of unit owners, establishes ground rules for meetings, including an open meetings requirement and a limitation on the use of closed sessions, creates procedures for resolution of alleged violations of condominium rules, and grants unit owners a right of access to condominium records. RP §§ 11-109(c), 11-109.1, 11-113,11-116(c). Also, during a specified period of time, the council of unit owners may disavow contracts entered into on behalf of the condominium by the developer. RP § 11-133. That section is the focus of your inquiry.
B. RP § 11-133
Section 11-133 provides as follows:
 (a) Within three years following the date on which units have been granted by the developer to unit owners having a majority of the votes in the council of unit owners, any lease, and any management contract, employment contract, or other contract to which the council of unit owners is a party entered into between the date the property subject to the condominium regime was granted to the developer and the date on which units have been granted by the developer to unit owners having a majority of votes in the council of unit owners may be terminated by a majority vote of the council of unit owners without liability for the termination. The termination shall become effective upon 30 days' written notice of the termination from the council of unit owners.
 (b) The provisions of this section do not apply to:
 (1) Any contract or grant between the council of unit owners and any governmental agency or public utility; or
 (2) A condominium that is occupied and used solely for nonresidential purposes.
The predecessor of RP § 11-133 was added to the State condominium law in 1974, as part of a comprehensive revision of that law. Chapter 641, Laws of Maryland 1974.[2] That revision was the result of recommendations by the Condominium Revision Committee of the Real Property, Planning and Zoning Section of the Maryland State Bar Association, which submitted a formal report to the General Assembly. The Committee report and its comments on the revised sections were reprinted in the Annotated Code of Maryland. See Editor's Note to Title 11, Real Property Article (1974 Cum. Supp.). The report indicated that the revised law provided consumer protection through a comprehensive disclosure and antifraud provision and that, in addition, "[a]ffirmative regulation over a developer's ability to control a project over a long term has been added by [RP § 11-133]." Id., p. 20. In a later comment elaborating the statutory provision, the Committee explained:
 [Section 11-133] contains entirely new material relating to the protection of the consumer. This section gives the council of unit owners, by a majority vote, the power to terminate any lease and any management and similar contracts which the council may have entered into while the "developer" controlled the council. This power to terminate expires three years following the date upon which the "developer" last had a majority of the votes in the council.
Id., p. 42. Thus, the evident purpose of this section is to permit the purchasers of residential condominium units to free the condominium of unfavorable long-term contracts bestowed on them by the condominium's developer as long as they act within a three-year window after they obtain effective control from the developer.
 II Proposed CCRC Condominium Structure
The proposed CCRC project would be similar in many respects to other CCRCs. In one large building it would encompass residences for the members of the community, community facilities such as dining halls, recreational areas, and similar amenities, and assisted living and skilled nursing facilities. However, the project would have a legal structure unique for a CCRC in Maryland. The residential units would all be part of a condominium that would be one unit of a three-unit master condominium regime. For the sake of clarity, we will refer to the subordinate residential condominium as the "Sub-Condominium" and to the three-unit master condominium as the "Master Condominium." A. The Sub-Condominium
The Sub-Condominium would include approximately 240 residential units that would be offered for sale to prospective CCRC residents. The Sub-Condominium would be governed by a council of unit owners consisting of the owners of the 240 residential units. However, the responsibilities of the Sub-Condominium council of unit owners would be limited. The Sub-Condominium would not control the community facilities or the health care facilities. Nor would it control the exterior walls or roof of the building. The only common elements of the Sub-Condominium would be the interior hallways of the residential areas.
The residential unit owners would be obligated under both a continuing care agreement and the condominium documents to pay mandatory condominium assessments for those services provided through the Sub-Condominium — e.g., maintaining the carpet in the hallways — and those provided through the Master Condominium — e.g., meals, recreation, and access to health care.
B. The Master Condominium
The Master Condominium would include three units: a Residential Unit, a Health Care Unit, and an Amenities Unit. The three Master Condominium unit owners would jointly own and control the exterior of the building, as well as the structural and utility components. It is anticipated that the Master Condominium council of unit owners would delegate responsibilities to a three-member board of directors.
The Residential Unit would consist of the 240-unit Sub-Condominium.[3] The Amenities Unit would include the dining hall and other facilities such as a library and crafts room and would provide hospitality services to the CCRC residents, who would pay a mandatory fee regardless of whether they used those services. The Health Care Unit would include assisted living and comprehensive nursing care facilities to which the CCRC residents would be assured priority access. However, a CCRC resident would only pay for assisted living or comprehensive care services if the resident elected to use those services. The resident would enter into a separate agreement for those services with the Health Care Unit at the time the resident began to receive the services.
The developer plans to sell the Health Care Unit and the Amenities Unit to a single entity (or two entities controlled by a single entity), although it might sell those units to separate entities not under common control. In any event, it is contemplated that the entities that own the non-residential units will be organized as limited liability companies ("LLCs"). The developer or an affiliate plans to have a minority interest in, and to be the manager of, the LLCs.
The Master Condominium council of unit owners would be responsible for providing continuing care to the residents in accordance with Annotated Code of Maryland, Article 70B, §§ 7
through 23. The Master Condominium council of unit owners would provide this care in large part through its legal relationships with the three Master Condominium units and their owners. That council would contract from time to time with the owner or owners of the Amenities Unit and the Health Care Unit to provide: (1) the services the council promised the residents, and (2) the guaranteed priority access to the Health Care Unit. The owners of the residential units would not control the Master Condominium council of unit owners and, accordingly, would have little power over contracts devised at the Master Condominium level.
 III Analysis
You have asked whether the contemplated condominium-within-a-condominium structure would violate RP § 11-133 "by allowing the developer to permanently control the leases, management, and other contracts" of the Master Condominium.
An initial question is whether RP § 11-133 would apply to one or both of the condominium regimes described above. By its terms, the statute does not apply to a condominium that is "occupied and used solely for nonresidential purposes." RP § 11-133(b)(2). Because the proposed Sub-Condominium would consist of residential units and the proposed Master Condominium would have one unit devoted to residential purposes, neither condominium would be used "solely" for nonresidential purposes. Thus, the exception would not pertain at either the Master Condominium or the Sub-Condominium level. Therefore, RP § 11-133 would apply to both condominiums.
The process for applying RP § 11-133 at the Sub-Condominium level is straightforward. Once a majority of the residential units have been transferred by the developer, the council of unit owners for the Sub-Condominium may exercise its right to terminate contracts for a period of three years. However, under the proposed structure the most significant contracts, from a CCRC resident's perspective, will be those entered into at the Master Condominium level. Although the Master Condominium council of unit owners will be able to exercise the termination right under RP § 11-133 once the developer has passed control of two of the units to individuals or entities not controlled by the developer, the residential unit owners will not control the Master Condominium council. With only one-third of the votes on the Master Condominium council of unit owners, the residential unit owners may not be able to elect even one member of the board of directors.
It should be noted that the proposed CCRC structure does not contemplate that the developer will permanently control the leases, management and other contracts of the Master Condominium. Under the proposed structure, as we understand it, the developer will own a minority interest in the Amenities Unit and the Health Care Unit. The authority to terminate contracts at the Master Condominium level under RP § 11-133 will not become effective until the developer has transferred control of at least two of the units of the Master Condominium.[4]
This structure could work to the disadvantage of CCRC residents who become unit owners of the Sub-Condominium. For example, in theory, a developer of such a structure might enter into contracts on behalf of the Master Condominium that the residents perceive as unfavorable. If the residents later sought to terminate those agreements, the owners of the Amenities Unit and the Health Care Unit, in which the developer would have an interest, could thwart that effort. Moreover, even if the developer terminated its relationship with the project entirely, the owners of the Amenities Unit and Health Care Unit could jointly control the Master Condominium council of unit owners, which would negotiate contracts for the services provided by those units to residents. In other words, the controlling members of the Master Condominium council of unit owners could be negotiating with related entities over the prices that the continuing care residents would pay for their services. There is some risk that charges and mandatory fees under these contracts could exceed the fair market value of the services and thereby erode the equity of the residents in their units.[5]
This raises the question whether the condominium-within-a-condominium model undermines the consumer protection purpose of RP § 11-133 — i.e., to limit a developer's ability to control, through long term contracts, the operation of a residential condominium project after a majority of the units have been transferred to others.
While this concern is understandable, it could arise in any mixed-use condominium where the residential units have been allocated a minority of the votes on the council of unit owners. Of course, the issue might not be as much of a concern in a typical mixed-use condominium where residents are not obligated to pay mandatory service fees to another unit, regardless of whether they use the services available in that unit. Nevertheless, the Maryland
Condominium Act does not appear to preclude such an arrangement. Rather, the Act appears to rely on market forces to prevent abuses by requiring full and effective disclosure.[6]
Under the Act, the Secretary of State reviews a proposed public offering statement for compliance with the Act's disclosure requirements, as a condition of registration of the condominium regime and, ultimately, the sale of its units. RP § 11-127. The Act requires that the vendor of a residential condominium unit provide extensive disclosure about the condominium, including, among other things, its governing documents, its components, its financial status and policies, and its plans for future expansion. Pertinent to the issue you have raised, the statute requires that the public offering statement for the condominium include any proposed management contracts and other contracts affecting the use of, maintenance of, and access to the condominium to which the unit owners or council of unit owners will be a party, as well as a statement concerning the right of the council of unit owners under RP § 11-133 to terminate such contracts. RP § 11-126(b)(4). In addition, the public offering statement must also describe provisions of the governing documents that affect the duration of developer control or the commencement of unit owner participation. RP § 11-126(b)(14). In providing such information, as well as the other information required by the statute, the vendor must not make any untrue statement of material fact or omit a material fact that is necessary to avoid misleading prospective purchasers. RP § 11-126(f).
Given those requirements, the vendor of a residential condominium-within-a-condominium would have to provide a detailed and comprehensible discussion of the impact of that structure on unit owners of the residential condominium. For example, a statement concerning the right of the council of unit owners to terminate contracts under RP § 11-133, without a clear discussion of the impact of the Master Condominium structure on that right, would be misleading. Similarly, a suggestion that a CCRC structured as a condominium would permit a resident to benefit from any increase in the unit's value would be misleading without some explanation of how the Master Condominium structure could affect and perhaps diminish that equity.
Of course, the contemplated development would also be subject to the statutes governing continuing care, which have their own disclosure standards. See Article 70B, §§ 7 through 23. Similar or additional disclosures could be required by the Department of Aging in the disclosure statement furnished to prospective CCRC residents. Id., § 11C(c)(22) (disclosure statement must include "material information concerning the facility or the provider as the Department requires...").
 IV Conclusion
In our opinion, the proposed Master Condominium structure would not violate RP § 11-133. However, the vendor must provide enhanced disclosure concerning the impact of that structure on the powers of the council of unit owners of the Residential Unit and on the equity interest of the residential unit owners. The General Assembly may wish to consider the desirability of amending the Condominium Act to increase the protection of residential unit owners in a condominium project comprised of a mixture of residential and nonresidential units.
J. Joseph Curran, Jr. Attorney General
Jeffrey H. Myers Assistant Attorney General
George Hughes Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions and Advice
[1] Common elements that are reserved for the exclusive use of some units, but not others, are known as "limited common elements." RP § 11-101(c).
[2] The provision was originally codified as RP § 11-125. Later amendments clarified the statutory language, created exceptions for non-residential condominiums and contracts with government agencies or public utilities, and recodified the statute as RP § 11-133. Chapter 681, Laws of Maryland 1980; Chapter 246, Laws of Maryland 1981; Chapter 572, Laws of Maryland 1986.
[3] The Maryland Condominium Act defines "unit owner" as "the person, or combination of persons, who hold legal title to a unit." RP § 11-101(r). The unit owners of the Sub-Condominium, as the "combination of persons" holding legal title to the Residential Unit of the Master Condominium, would together have the rights of the "unit owner" of the Residential Unit. The council of unit owners of the Sub-Condominium, which would be a legal entity designated by statute as its governing body (RP § 11-109(a)), would not itself hold legal title to the Residential Unit of the Master Condominium, although the unit owners could choose to have it act on their behalf with respect to the Master Condominium. The residential unit owners would thus have the right to inspect the Master Condominium's records and, in certain circumstances, to require an audit of the Master Condominium's books. RP § 11-116. In addition, in most instances, the consent of residential unit owners would be required to amend the condominium declaration. RP § 11-103.
[4] If the developer continued to control the other two units of the Master Condominium, the authority to terminate contracts under RP § 11-133 would not yet be effective. RP § 11-133 can only be invoked after the developer cedes control of the council of unit owners — an event for which the statute sets no deadline.
[5] Because the Master Condominium council of unit owners is governed by Maryland corporation law, it would be subject to restrictions on approval of "interested director transactions." See RP § 11-109(d) (council "is subject to those provisions of Title 5, Subtitle 2 of the Corporations and Associations Article..."); Annotated Code of Maryland, Corporations and Associations Article ("CA"), § 5-201 (Maryland General Corporation Law generally applies to nonstock corporations); CA § 2-419
(conditions for approval of interested director transactions).
[6] We do not mean to suggest that a developer could circumvent RP § 11-133 by artificially designating common elements of a property as separate units or allocating voting rights among units in a manner that did not have some reasonable basis. As we understand it, the proposed Health Care Unit and Amenities Unit will each occupy considerable space in the building and will function as substantial businesses offering health care and other significant services. *Page 45