Neel, J.
This case arises out of a dispute over parking spaces. The Muzzey High Condominium (Condominium), a converted Lexington public school building, is located near the center of the Town of Lexington (Town). It comprises 71 residential condominium units and a Senior Center unit. The Senior Center, operated by the Town, is located on the first floor of the four-story condominium building. The Condominium’s master deed provides that ”[t]here shall be appurtenant to each Unit the right to park one registered automobile in the area designated ‘Parking’ . . . subject to such rules as may from time to time be established by the Trustees.” The Condominium’s 118 parking spaces[1] have proven at times insufficient to accommodate both residents’ vehicles and those of persons visiting the Senior Center.
Plaintiff Trustees of Muzzey High Condominium Trust (Trustees) seek declaratory and injunctive relief against the Town, alleging that there is a dispute as to whether the Trustees are authorized to take the remedial action they have taken, i.e., setting aside 72 parking spaces for unit-owner parking only. The Town counterclaims for declaratory and injunctive relief, alleging that the Trustees have acted in violation of statutory requirements and of the Declaration of Trust.
The case was tried without jury. Following the trial, the Court instructed the parties to make a last attempt to resolve their dispute, because any resolution to which both sides contributed and agreed would likely be a better, and more workable, solution than one imposed by the Court. The parties report that they have failed to reach an agreed solution, and leave it to the Court to resolve their dispute. Accordingly, and for the reasons set forth below, judgment shall enter declaring the rights of the parties, as ordered at the conclusion of this decision.
FINDINGS OF FACT
On the basis of the Amended Joint Stipulation of Facts, the credible evidence at trial, and reasonable inferences drawn therefrom, I find as follows.
The Trustees bring this action on behalf of the Condominium Trust pursuant to G.L.c. 183A, § 10(b)(4).
The Town has not brought its action in counterclaim derivatively under Mass.R.Civ.P. 23.1.
The Condominium is a Massachusetts condominium located at 1475 Massachusetts Avenue, Lexington, Middlesex County, Massachusetts, and is subject to the provisions of G.L.c. 183A.
The Condominium was duly created by Master Deed dated May 1, 1985 (Master Deed), recorded with the South Middlesex County Registry of Deeds (Registry).
Paragraph 12 of the Master Deed, entitled “Managing Entity,” provides that “(t]he entity through which the Unit Owners will manage and regulate the Condominium established hereby is the Muzzey High Condominium Trust, a Massachusetts trust.”
The Muzzey High Condominium Trust was created under a declaration of trust, dated May 1, 1985 (Trust), recorded with the Registry.
The plaintiffs are the Board of Trustees under the Trust.
The defendant Town, a municipal corporation, was and is the owner of a unit at the Condominium which houses the Town’s Senior Center.
Before the development of the Condominium, the property had been owned by the Town and, at one time, was used by it as the Muzzey Junior High School.
In the early 1980s the Town resolved to convert Muzzey Junior High into a condominium, which action would serve two Town purposes: provision of affordable housing in the Town, and creation of a senior activities center for use by senior citizens in the Town.
*93 Among the development proposals the Town considered was one submitted by Sydney Noyes Associates. On February 8, 1983, the Town’s Planning Board reviewed the Noyes proposal in a report titled “Reuse of the Muzzey School Property" (Planning Board Report) . The Planning Board noted that the Sydney Noyes Associates proposal, as selected by the Board of Selectmen,
is to convert the former Muzzey Junior High School building into an apartment building containing between 65 and 71 dwelling units, each to be owned on a condominium basis. Inclusion of a senior citizens center, comprising about 8000 square feet of net floor space, is presented as an option for the Town’s consideration. If the development includes a senior center, 130 parking spaces will be provided; if not, 100 parking spaces are proposed.
The Planning Board Report further states, at Section 2, “Parking”: “If the senior center is constructed, there will be an opportunity for overlapping use of parking spaces, with the residents occupying some spaces in the evening and the seniors occupying some of the same spaces during the 9:00 a.m.-4:30 p.m. time period that the center maybe open.”
The Planning Board Report concludes, in Section 8, “Recommendation”:
The Planning Board recommends that the Town Meeting approve the development plan . . . essentially as it was presented at the Planning Board’s public hearing, for the following reasons: ... 6. The Planning Board finds no appreciable problems with the site plan, the density, or other design features of the proposal.
On February 14, 1983, at a Special Town Meeting, the Town accepted the Planning Board’s recommendation and voted to authorize its Selectmen “to convey the Muzzey Junior High School property... to Sydney Noyes Anderson, Inc. for the purchase price of $238,000 plus the construction of a senior center and on such other terms as the Selectmen shall determine
On October 31, 1983, the Town entered into a Land Disposition Agreement (LDA) with Sydney Noyes Anderson, Inc. (developer), which provided that, in consideration of the payment by the developer to the Town of $238,000, and the conveyance to the Town of a Senior Center facility to be located upon the property, the Town would convey the property to the developer subject to development restrictions.
Among the restrictions contained in the LDA was the requirement that the Developer submit the property to the condominium form of ownership under G.L.c. 183A,.the Massachusetts Condominium Statute.
The LDA provides, at Article II, 2.1(b):
Within 30 days from the date of this Agreement, the Developer shall deliver to the Town Manager . . . proposed forms of documents (the “Condominium Documents”) to be used by the Developer to submit the Properly to the provisions of Chapter 183A . . . in order to convert the Property into a mixed use condominium . . . The forms of the declaration of trust . . ., the by-laws of the Condominium trust and the master deed and unit deeds shall be subject to the written approval of the Town ... [which] may disapprove of the Condominium Documents or any . of them which are. not consistent with the provisions or intent of this Agreement.
The approval of each of the Condominium Documents by the Town shall be conclusively established by an endorsement thereon signed and acknowledged by the Town Manager . . . stating that such document has been approved by the Town . . .
On November 28, 1983, the Town’s Board of Selectmen, acting as the Special Permit Granting Authority under G.L.c. 40A and the Town’s zoning by-law, approved a special permit for conversion of the Muzzey Junior High School to the proposed condominium. The Board defined the “Proposed Conversion” which it was approving as
the development proposal approved by the Town Meeting on February 14, 1983,... with such minor deviations as are contained in that certain Land Disposition Agreement dated October 31, 1983, by and between the Town of Lexington and Sydney Noyes Anderson, Inc.....as are shown on the plans submitted with the application for special permit, which plans conform substantially to the development proposal approved by the Town Meeting . . .
(Ex. 3.)
In its “Findings and Decisions,” the Planning Board states:
[a]fter site plan review under Section 3.4 of the zoning By-Law, consideration of recommendations from the Planning Board, Conservation Commission, Recreation Committee, Town Engineer, Board of Health, and Building Commissioner and in accordance with Section 9.3, the Board of Selectmen finds:
1 . . . the Proposed Conversion will constitute a suitable development and will not result in substantial detriment to the neighborhood.
10. The Town and the developer shall execute, acknowledge and record an amendment to the Land Disposition Agreement in the form attached hereto.
This permit will lapse on July 1, 1985, if action is not taken under it and if all work is not completed in accordance with the Land Disposition Agree-, ment. Copies of this decision have been filed with the Planning Board and the Town Clerk of the Town of Lexington.
*94 Before acting on this permit, it will be necessary to secure permits from the Building and Inspection Department and any necessary zoning variances from the Board of Appeals.
In accordance with law, before this permit becomes effective, a copy hereof must be recorded at the Registry of Deeds by the petitioners.
The Board hereby makes a detailed record of all its proceedings relative to such petition and hereby sets forth that the reasons for its decision are its findings hereinbefore set forth and the testimony presented at the said hearing, including that herein summarized, and directs that this record shall be filed in the office of the Town Clerk of Lexington and shall be a public record and that notice of this decision shall be mailed forthwith to each party in interest.
On December 19,1983, the Town and the developer executed the First Amendment to the Land Disposition Agreement (Amended LDA). Paragraph 2(c) of the Amended LDA, entitled Statement of Purpose, states that “(t]he Town’s primary purpose in the sale of the Property to permit conversion of the surplus Muzzey Junior High School building into the Condominium is to provide ‘affordable’ housing, and a senior activities center, in the Town of Lexington.”
On June 11, 1984, pursuant to the Amended LDA, the Town conveyed the land, with the building and other improvements thereon, to R. Kirk Noyes, as Trustee of Muzzey Realty Trust (the declarant), by a quitclaim deed recorded with the Registry that date. The quitclaim deed identifies the Town as grantor
acting by and through its Board of Selectman by the authority of the vote adopted by the Inhabitants of the Town of Lexington under Article 2 at the Special Town Meeting held on February 14, 1983.
The quitclaim deed provides that:
[tlhis deed is made and executed upon and is subject to the covenant, which shall run with the land conveyed hereby, that the Grantee and its successors and assigns shall at all times comply with the terms of a Special Permit Hearing and Decision (the “Special Permit”), filed with the Town Clerk of Lexington on January 5, 1984, a copy of which is to be recorded herewith, issued by the Board of Selectmen of the Grantor with reference to the Property.
On June 13, 1984, the LDA and Amended LDA were recorded with the Registry.
On May 13, 1985, Robert Hutchinson, then the Town Manager, signed the Master Deed, prior to its being recorded, under the words “Approved as of May 13, 1985, Town of Lexington."
After the Condominium was established, the declarant, pursuant to the LDA, conveyed to the Town a unit, commonly referred to as the Senior Center unit.
Paragraph 4 of the Master Deed, entitled “Designation of Condominium Units,” provides in relevant part that “(t]he Building is divided into seventy-two (72) units (the Units), of which 71 are residential Units and one is a Senior Center Unit."
Paragraph 6(b) of the Master Deed, entitled “Common Areas,” identifies the common areas and facilities of the Condominium as including the “the walkways, stairways, common driveway and parking areas, and other improvements on such land, including.. . landscaping ...”
Paragraph 6 of the Master Deed further provides that “[t]he use by the owners of the Units (the Unit Owners) of the Common Areas and Facilities shall be subject to (i) the terms and provisions of this instrument and of the Bylaws of the Muzzey High Condominium Trust (the Condominium Trust) . . . (ii) rules and regulations promulgated pursuant thereto with respect to the use thereof..."
Paragraph 8 of the Master Deed (“Purpose”) provides that “(t]he Buildings and the Units are intended to be used solely for residential purposes except for the Senior Center Unit. The Senior Center Unit is intended to be used for programs and activities of senior citizens.”
Paragraph 10 of the Master Deed (“Parking”) provides that “(t]here shall be appurtenant to each Unit the right to park one registered automobile in the area designated ‘Parking’ on Exhibit D subject to such rules as may from time to time be established by the Trustees.”
Paragraph 11 of the Master Deed provides that the Master Deed:
maybe amended by the vote of Unit Owners entitled to seventy-five percent (75%) or more (except as set forth in subparagraph (d) below) of the undivided interests in the Common Areas and Facilities cast in person or by proxy at a meeting duly held in accordance with the provisions of the Declaration of Trust (including the Bylaws) or, in lieu of a meeting, any amendment may be approved in writing by Unit Owners entitled to seventy-five percent (75%) or more (except as set forth in subparagraph (d) below) of the undivided interests in the Common Areas and Facilities. Any such amendment shall be evidenced by an instrument in writing (i) signed and acknowledged by the Trustees of the Condominium Trust pursuant to the Bylaws thereof, (ii) signed by Unit Owners entitled to seventy-five percent (75%) or more of the undivided interests in the Common Areas and Facilities or containing a copy of the vote adopted by Unit Owners entitled to seventy-five percent (75%) or more of said undivided interest certified by a majority of the Trustees, and (iii) duly recorded with the Middlesex County (South) Registry of Deeds.
*95 Paragraph 11(e) of the Master Deed states in relevant part that “No instrument of amendment seeking to . . . (ii) alter the definition of common areas or facilities . . . shall be of any force or effect unless such amendment shall have been assented to in writing by at least fifty-one (51) percent of the holders of first mortgages of record . . .”
Paragraph 13 of the Master Deed states that the:
Master Deed and the Condominium are subject to the restrictions set forth in a deed, dated June 11, 1984, from the Town of Lexington to the Grantor, and recorded with the Middlesex County (South) Registry of Deeds in Book 15624 at Page 537.
Exhibit B to the Master Deed provides that the Senior Center is allocated a 4.8% undivided interest in the common area at the Condominium. The remaining 95.2% of the undivided interest is allocated to the 71 residential units.
On May 9, 1985, Town Manager Hutchinson signed the Trust under the words “Approved as of May 9, 1985 Town of Lexington.“
Article II, Section 2.1 of the Trust, entitled “General Purpose,” states:
[a]ll of the rights and powers in and with respect to the Common Areas and Facilities of the Muzzey High Condominium (the Condominium), as established by and defined in a Master Deed of even date and recorded herewith (the Master Deed) which are, by virtue of provisions of Chapter 183A of the Massachusetts General Laws, conferred upon or exercisable by the organization of unit owners of the Condominium . . . shall vest in the Trustees ... in trust to exercise, manage, administer and dispose of the same .... for the benefit of the owners . . .
Article III, Section 3.2 (“Manner of Acting”), provides that “(i]n any matters relating to the administration of the trust hereunder and the exercise of the powers hereby conferred, the Trustees may act by majority vote at any duly called meeting at which a quorum is present . . . The Trustees may also act without a meeting by instrument signed by a majority of their number.”
Article V, Section 5.1 of the Trust provides:
The Trustees shall, subject to and in accordance with all applicable provisions of Chapter 183A, have the absolute control, management and disposition of the trust property (which term as herein used shall insofar as applicable be deemed to include the Common Areas and Facilities) as if they were the absolute owners thereof, free from the control of the Unit Owners (except as limited in this trust instrument) and . . . with full power and uncontrolled discretion, subject only to the limitations and conditions contained herein and in the provisions of Chapter 183A, at any time and . . . without the necessity of applying to any court or to the Unit Owners for leave so to do:
(1) To adopt and amend from time to time rules and regulations relating to the operation of the Condominium;
(o) Generally, in all matters not herein otherwise specified, to control, to do each and every thing necessary, suitable, convenient, or proper for the accomplishment of any of the purposes of this Trust or incidental to the powers granted herein or in said Chapter 183A, to manage and dispose of the trust property as if the Trustees were the absolute owners thereof and to do any and all acts ... which by their performance thereof shall be shown to be in their judgment for the best interest of the Unit Owners.
Article V, Section 5.3 of the Trust provides that “[t]he Trustees shall be responsible for the proper operation, maintenance, repair and replacement of the Common Areas and Facilities of the Condominium.”
Article V, Section 5.9 of the Trust provides that “(t]he Trustees may at any time and from time to time adopt, amend and rescind administrative rules and regulations governing the details of the operation and use of the Common Areas and Facilities that are consistent with provisions of the Master Deed and this Trust.”
A “Unit Deed” for the Senior Center unit was executed December 10,1985, and approved as of May 19, 1987 by Robert Hutchinson, Town Manager. That deed provides that the Senior Center Unit “is to be used for programs and activities as set forth in paragraph 8 of the Master Deed . . .”
The Condominium, as finally approved by the Town and as built, provides for 71 residential units, a Senior Center unit comprising 10,045 square feet (25% larger than the 8,000 square feet proposed in the plan recommended in February 1983 by the Planning Board), and 118 parking spaces (twelve fewer spaces than recommended by the Planning Board).
Each individual unit owner received a “Unit Deed” providing that the unit “is subject to . . . [the] Master Deed ...”
Prior to 1990, the shared parking arrangement worked well for unit owners and Senior Center visitors; there were no significant parking problems. Thereafter, the Senior Center sponsored trips for seniors which variously lasted until afternoon, into the evening, or overnight. Departures in buses for these trips were staged from the Condominium’s parking lot, and senior trip participants would leave vehicles in the parking lot for the duration of a trip, limiting spaces available to unit owners. In addition, on evenings when Senior Center functions were scheduled, unit owners had difficulty finding parking spaces.
In a December 14, 1993 memorandum, the Town’s building inspector, Steven Frederickson, wrote to *96 Linda Vine, then the Senior Center director, “regarding the parking issue” at the Condominium. He notes that the concerns of “tenants”
primarily involve the times when there may be field trips which extend beyond the closing hours of the [Senior Center], It is their concern that people who are going on field trips are leaving their cars parked in the lot for extended periods, beyond the closing hours of the center and sometimes overnight It is their feeling that these are the times when the parking is at a premium.
. . . [T]he approval of the parking plan for the Muzzey Condominium project noted that fewer parking spaces than required by the Zoning By-Law were being provided due to the fact that the Senior Center would be open only during the day, when most of the tenants would be away from the building. It was felt that due to this, fewer spaces were needed. For the most part, this appears to work out well. However, in my opinion, parking of vehicles beyond the hours that the Senior Center is open is not in keeping with the intent of the Special Permit. Therefore, I would appreciate it if you could make every effort to arrange alternative parking or car pooling when you anticipate that activities will extend beyond the closing hour of the center.
Ex. 65 (emphasis added).
In the ensuing years, parking area space was on occasion lacking for unit owners on evenings when Senior Center functions were scheduled. On October 29, 1999, the Trustees wrote to Nancy Freed, then director of the Senior Center, as follows:
Over the past several years, repeated occasions have occurred where Muzzey High residents have returned to their homes and been unable to obtain a parking space in the lot. . . We have always been able to associate these occasions with a special event or tour sponsored by the Senior Center.
. . . We feel that it is entirely inappropriate for the Senior Center to be encouraging people to park in our lot outside of routine operating hours and strongly request that other parking arrangements be made for evening and overnight tours.
... [I]t was assumed by the Planning Board that the hours of use by the Senior Center and the residents would be complementary. This has been true for normal daily operations, but special events and tours exceed the capacity of the lot.
.. . We would prefer not to have to step in to control use of the lot through security guards, towing and/or the assignment of spaces, but we have no choice as the Senior Center has continued to over-strain the lots’ [sic] capacity. We intend to tow as necessary outside the Senior Center’s normal hours of operation of 8 am to 4:30 pm .. . and as necessary to assure that residents have sufficient parking.. . We hope you will communicate to [your clients] that
they will be towed outside normal operating hours, . . . and when they park in designated resident spots.
Ex. 36 (emphasis added). As the highlighted text demonstrates, it is the clear import of the letter, and I so find, that the “complementary” resident and Senior Center uses resulted in no significant parking problems between the 8 a.m. and 4:30 p.m. operating hours of the Senior Center, and that the primary concern of the Trustees in 1999 was lack of parking spaces after 4:30 p.m.
In the early summer of 2000, the Trustees received notice of a day trip, conducted by the Senior Center, to the tall ships at Boston Harbor on July 14, 2000. On or about July 10, 2000, the Trustees conducted a meeting, and by majority vote (a quorum being present) adopted a rule regulating use of the common area parking lot (July 10, 2000 parking rule). The rule provided that 72 spaces be cordoned off and marked for the exclusive use of unit owners, and that the remaining spaces be for use by unit owners and guests, including Senior Center visitors. The Trustees conducted no formal investigation or survey of parking at the Condominium prior to adopting the rule.
In accordance with the July 10, 2000 parking rule, on July 14, 2000, the Trustees caused 72 spaces in the common area parking lot to be marked off with barrels, yellow tape and signs. The signs read “Parking for Muzzey Residents only — All others will be towed at Owners Expense.” The remaining spaces were not so marked; a sign in front of those spaces read “Senior Center and Guests Only.”
Subsequently, the Trustees replaced the barrels, tape and signs with four free-standing metal signs, which have continued to mark off areas of the parking lot. The four free-standing metal signs include signs stating “Muzzey Unit Owner Parking Only Including Permitted Residents one space per unit,” and “Senior Center Guest & Unit Owner/Resident Parking."
The parking area that is the subject of the July 10, 2000 parking rule is specifically designated in Paragraph 6(b) of the Master Deed as common area.
The Town has made no allegation that it has suffered any actual pecuniary loss as a result of any of the acts or omissions of the Trustees.
The Trustees allege that frequently spaces are not available for one or more unit owners between the hours of 9 a.m. and 4:30 p.m. They have offered no credible evidence to support that allegation, which in any event is contradicted by the building inspector’s December 14, 1993 memorandum (Ex. 65), and the Trustees’ own October 29, 1999 letter (Ex. 36), both quoted above.[2] Moreover, the Town offered the following evidence, which the Court credits: on Wednesday, August 29, 2000, at 1:15 p.m., 49 of the 72 spaces cordoned off were vacant; on Thursday, August 30, 2000, at 3:00 p.m., 54 such spaces were vacant; on *97 Tuesday, September 5, 2000, at 12:30 p.m., 43 were vacant; at 3:30 p.m that day, 41 were vacant; on Wednesday, September 6, 2000, at 1 p.m., 48 were vacant; on Thursday, September 7, 2000, at 3 p.m., 44 were vacant; on Friday, September 8, 2000, at 2:30 p.m., 39 were vacant; on Monday, September 11, 2000, at 8:30 a.m. 49 were vacant; at 11:40 a.m. that day, 54 were vacant; at 1:45 p.m. that day, 50 were vacant; on Wednesday, September 13, 2000, at 2:30 p.m., 48 were vacant; on Thursday, September 14, at 8:30 a.m. 43 were vacant; on Monday, September 18, at 2 p.m., 55 were vacant; on Wednesday, September 20, 2000, at 8:05 a.m., 39 were vacant; on Thursday, September 21, 2000, at 8:20 a.m., 43 were vacant; on Monday, September 25, 2000, at 4:15 p.m., 49 were vacant; on Monday, December 11, 2000, at 2 p.m., 37 were vacant.
In short, the Trustees have not established that daytime use of the Senior Center (weekdays between 8 a.m. and 4:30 p.m.) has resulted in inadequate parking for unit owners. I find that the Senior Center operations during those normal hours of operation have not deprived unit owners of parking to which the Master Deed entitles them.
More problematical are the weekday evening hours after 4:30 p.m. Although most Senior Center activities occur prior to that time, the Senior Center schedules some evening activities; were those activities to be conducted in, or to depart from, the Senior Center, unit owners would have a substantially inadequate number of spaces in which to park, but for the July 10, 2000 parking rule.
Town-sponsored activities and uses at the Senior Center are primarily and substantially devoted to the Center’s target population, although some community education classes and social services benefit non-seniors as well. The latter do not significantly affect the availability of parking at the Condominium.
As of December 2000, residents in approximately fourteen units neither had vehicles nor used spaces in the parking lot.
The July 10, 2000 parking rule has resulted in reduced patronage of the Senior Center. In the succeeding year, visits to the Center dropped by about 8,000. The Town offered no evidence of the number of visits to the Center in the years before 1990, when there were no significant parking problems. However, it is clear that the use of the Senior Center has grown. As of August 2000, the Town had concluded that the Senior Center “is no longer adequate to house the expanding activities and increasing size of the population it serves." Ex. 56. It is reasonable to conclude that growth in use of the Senior Center contributed to the parking problem.
RULINGS OF LAW
An actual controversy exists between the parties with respect to the validity and enforceability of the July 10, 2000 parking rule. Declaratory judgment determining the issues presented, and declaring the rights of the parties, is appropriate under G.L.c. 231 A.
The Town makes the following challenges[3] to the July 10, 2000 parkingrule, each of which the Trustees dispute.
1. The Town asserts that paragraph 10 of the Master Deed, which provides that “(tlhere shall be appurtenant to each .Unit the right to park one registered automobile" in the parking lot, is ambiguous because it does not state whether each unit owner is granted a right to an exclusive or non-exclusive parking space. Town’s Proposed Rulings Nos. 2-10. The Town argues that the ambiguity should be resolved by a finding that Town Manager Hutchinson, in executing the Master Deed and the LDA for the Town, intended “that the Senior Center and Muzzey High Condominium residents would share the entire parking area and that no parking spaces would be dedicated exclusively to residents or to the Senior Center." Town’s Proposed Ruling No. 11.
2. The Town claims that, by adopting the July 10, 2000 parking rule, the Trustees exceeded their authority. The Town argues that “(Reasonable use restrictions respecting the use of the common areas may be enforced by the organization of unit owners only if they are contained in the Master Deed or the By-laws,” Town’s Proposed Ruling No. 15, and that the Trustees failed to obtain necessary consent for amendment of either the Master Deed or the By-laws. Town’s Proposed Rulings Nos. 16-20.
3. The Town asserts that the July 10, 2000 parking rule is unreasonable. Town’s Proposed Rulings Nos. 21-23.
4. The Town claims that the Trustees failed to comply with G.L.c. 183A, §§5(b)(2)(ii) and 5(c), in that they failed to secure the Town’s consent before “designating a portion of the parking area as a limited common area . . .” Town’s Proposed Rulings Nos. 28-34. The Town also argues that the Trustees failed to designate the alleged limited common area in the form of a recorded amendment to the Master Deed, as required by §5(c). Town’s Proposed Rulings Nos. 35-36.
5. The Town claims that the Trustees violated §5.3 of the Declaration of Trust by jeopardizing the safety of seniors and others in the parking lot. Town’s Proposed Rulings Nos. 37-38.
The Court addresses below each of the Town’s challenges to the July 10, 2000 parking rule.
I. Alleged Ambiguity of Paragraph 10 of the Master Deed
Paragraph 10 of the Master Deed grants to each unit owner a right, “appurtenant to each Unit,” to park one automobile “in the area designated ‘Parking’. . . subject to such rules as may from time to time be established by the Trustees." The ambiguity of which the *98 Town complainsthat the paragraph is "silent as to whether it grants each unit owner a right to an exclusive or a non-exclusive parking space,” Town’s Proposed Ruling No. 7is present neither in the language of Paragraph 10 nor in the facts of this case.
An “exclusive parking space” would be a single, specific space in which a unit owner had an exclusive right to park an automobile. Paragraph 10 raises no question of any such exclusivity; it speaks in terms of the entire common area parking lot, not single spaces. More to the point, the July 10, 2000 parking rule establishes no “exclusive parking space" for any unit owner. Rather, it establishes two areas within the common parking area, each of which is equally available for parking of one automobile for each unit owner, including the Senior Center. The dispute in this case arises not out of any deprivation by the Trustees of the Senior Center’s rights under Paragraph 10, but out of the Trustees’ manner of regulating the common parking area to accommodate both the right of each unit owner (including the Senior Center) to a single space somewhere in the parking lot, and the needs of the Senior Center to have adequate visitor parking.
Alleged Unauthorized Regulation: Failure of Trustees to Amend Master Deed or By-Laws to Include July 10, 2000 Parking Rule
The Town asserts that the Trustees may impose “reasonable use restrictions” on the common areas only if such restrictions are contained in the Master Deed or By-laws, whether in the originals thereof or by amendment; where the July 10, 2000 parking rule is contained in neither, the Town argues, it is invalid.
The Town relies on G.L.c. 183A, §11(e), as interpreted by Johnson v. Keith, 368 Mass. 316, 319-20(1975), and Granby Heights Ass’n, Inc. v. Dean, 38 Mass.App.Ct. 266, 268 (1995). Section 11 provides that;
.. . [T]he by-laws of the organization of unit owners shall provide at all times for at least the following:
(d) The method of adopting and of amending administrative rules and regulations governing the details of the operation and use of the common areas and facilities.
(e) Such restrictions on and requirements respecting the use and maintenance of the units and the use of the common areas and facilities, not set forth in the master deed, as are designed to prevent unreasonable interference with the use of their respective units and of the common areas and facilities by the several unit owners.
Granby states that §11(e) “has been held to permit regulation of the use of a condominium unit that unreasonably interferes with the enjoyment by the various unit owners of their units, but only if the restriction is contained in the by-laws or master deed.” Granby Heights Ass’n, Inc. v. Dean, supra, 38 Mass.App.Ct. at 268, citing Johnson v. Keith, supra, 368 Mass. at 319-20, and Noble v. Murphy, 34 Mass.App.Ct. 452, 454 & n. 4 (1993).
The same principle does not apply to common area restrictions, however. In Johnson v. Keith, supra at 319, the court noted that “by statute administrative rules and regulations may govern the details of the use and operation of common areas and facilities. G.L.c. 183 [sic], §ll(d).” (emphasis in original). As noted in Noble v. Murphy, supra at 454 & n. 4, “[t]he court [in Johnson], in effect, decided that restrictions relating to the use of a condominium unit as distinguished from those relating to use of the common areas andfacilities must be contained in either the by-laws or master deed to be enforceable under G.L.c. 183A.” (Emphasis in original.)
Here, as the Trustees point out, the July 10, 2000 parking rule restricts use of the common area parking lot, not use of units. Accordingly, the Trustees did not act outside their authority by enforcing the parking rule without first causing it to be incorporated into the Master Deed or By-laws.
III. Alleged Unreasonableness of the July 10, 2000 Parking Rule
The Town next argues (1) that, under Noble v. Murphy, supra at 457, rules adopted by the Trustees are subject to a test of reasonableness, and (2) that the July 10, 2000 parking rule fails the reasonableness test.
In Noble the court upheld enforcement of a no-pets by-law adopted under c. 183A, §11(e). While the parking rule in the present case is governed by § 11(d), neither party has offered any basis for applying a different standard, nor is there an obvious reason for doing so. Indeed, the court in Noble quotes with approval a treatise stating that ”[t]he most common standard of review [of condominium use restrictions) is equitable reasonableness.” The court also quotes the formulation in Hidden Harbour Estates, Inc. v. Norman, 309 So.2d 180, 182 (Fla.Dist.Ct.App. 1975):
“[T]he test is reasonableness. If a rule is reasonable the association can adopt it; if not, it cannot. It is not necessary that conduct be so offensive as to constitute a nuisance in order to justify regulation thereof.” [citing Hidden Harbour] This approach recognizes the discretion of the majority of unit owners while at the same time limiting their rule-making authority to those matters “that are reasonably related to the promotion of the health, happiness and peace of mind of the unit owners.” [M.]
Noble v. Murphy, supra at 458. Here, the same test of reasonableness limits the rule-making authority of the Trustees to those matters reasonably related to unit owners’ health, happiness and peace of mind concerning parking.
*99 The Trustees acknowledge the reasonableness test[4] but urge the Court to adopt a business judgment test, citing Pederzani v. Guerriere, 4 Mass. L. Rptr. 447, 1995 WL 1146832 (Mass. Super. 1995). In Pederzani, which involved claims of breach of fiduciary duty against the condominium trustees for failure to correct defects on the property and to collect common charge assessments, the judge on summary judgment motions concluded that, while the question was undecided in Massachusetts, the business judgment rule, as formulated in Levandusky v. One Fifth Avenue, 75 N.Y.2d 530, 537-39, 554 N.Y.S.2d 807, 553 N.E.2d 1317 (1990), was the appropriate standard to apply. Under that standard, as urged by the Trustees, the court would not scrutinize the reasonableness of the Trustees’ actions, nor substitute its judgment for theirs unless it found that they acted arbitrarily and capriciously.
The Court declines to adopt the business judgment test in the circumstances of this case. Unlike Pederzani, where the claim was breach of fiduciary duty in the management of trust assets, the claims here have to do with the extent of the Trustees’ authority to adopt and enforce a parking rule. Where the Massachusetts Appeals Court has indicated that, in reviewing condominium use restrictions, “the test is reasonableness,” Noble v. Murphy, supra at 458, this Court will apply that standard.[5]
Reason supports the Trustees’ July 10, 2000 parking rule, but only in part. Over the decade leading up to July 2000, unit owners experienced frequent parking shortages during evenings and some weekends, punctuated by critical shortages when the Senior Center sponsored off-site excursions. Those shortages were caused by the presence of vehicles of Senior Center visitors in the common area parking lot after 4:30 p.m. weekdays, and occasionally on weekends.[6]
By contrast, there is little evidence to support the Trustees’ claim that shortages of parking occurred weekdays between 8 a.m. and 4:30 p.m.; indeed the Court has found otherwise. The Trustees have established no basis upon which to support the imposition of the July 10, 2000 parking rule during those hours.
Accordingly, I conclude that the July 10, 2000 parking rule is reasonable to the extent that it applies outside the normal business hours of the Senior Center, i.e., outside the hours of 8:00 a.m. to 4:30 p.m. weekdays.
The Court’s evaluation of reasonableness may also be informed, if not determined, by consideration of the parties’ reasonable expectations regarding the sharing of the common parking area by unit owners and Senior Center visitors. On the one hand, the Town:
1.by its Planning Board and Board of Selectmen, which respectively endorsed and selected the Sydney Noyes Associates proposal in 1983, knew that that proposal provided 130 parking spaces ”[i]f the development includes a senior center,” and that the project as built provides only 118 spaces;
2. by its Board of Selectmen and other appropriate agencies and boards, considered and granted all necessary permits for the Condominium to be built with 118 spaces, and with a Senior Center that was 24% larger than that contained in the plan recommended in February 1983 by the Planning Board;
3. by its town manager, Robert Hutchinson, “approved” in May 1985 the Master Deed, which provided, at paragraph 6, that the common area and facilities “shall be subject to . . . rules and regulations promulgated . . . with respect to the use thereof. . .”;
4. by its town manager who “approved” in May 1985 the Trust, which provided, at Article III, Section 3.2, that “(i]n any matters relating to the administration of the trust hereunder and the exercise of the powers hereby conferred, the Trustees may act by majority vote at any duly called meeting . . .”; at Article V, Section 5.1, that “(t]he Trustees shall, subject to [G.L.c. 183A], have the absolute control, management and disposition of the trust property [including common areas] as if they were the absolute owners thereof, free from the control of the Unit owners (except as limited in this trust instrument) . . . [t]o adopt and amend from time to time rules and regulations relating to the operation of the Condominium . . .”; and, at Article V, Section 5.3, that ”[t]he Trustees may . . . adopt administrative rules and regulations governing the details of the operation and use of the Common Areas and Facilities that are consistent with provisions of the Master Deed and this Trust”;
5. by its building inspector, Steven Frederickson, who stated that “parking of vehicles beyond the hours that the Senior Center is open is not in keeping with the intent of the Special Permit.”
On the other hand, the Trustees:
1. knew that prior to 1990, the shared parking arrangement between unit owners and Senior Center visitors worked well, with no significant problems;
2. knew in 1993 that the concerns of residents “primarily involved] the times . . . beyond the closing hours of the center and sometimes overnight... these are the times when the parking is at a premium” (Ex. 65);
3. stated in 1999 that, “it was assumed by the Planning Board that the hours of use by the Senior Center and the residents would be complementary. This has been true for normal daily operations, but special events and tours exceed the capacity of the lot.” (Ex. 36)
In short, both sides have been aware that the original plan contemplated shared parking between unit owners and Senior Center visitors; that the plan worked well until 1990; that thereafter, it continued to work well during the weekday business hours of the Senior Center, when many unit owners were at work *100 or otherwise away from the Condominium; and that the problems which began in 1990, and continued to July 2000, occurred outside the Senior Center’s normal hours of operation. In light of the above, it was reasonable for the Trustees to regulate parking outside the Senior Center’s normal hours, and unreasonable to regulate parking during those hours.[7]
IV. Alleged Unauthorized Designation of a Limited Common Area
The Town claims that the July 10, 2000 parking rule constitutes the designation of a portion of the common parking area (i.e., the 72 spaces designated for unit owners only) as a "limited common area,” as to which the Trustees failed to obtain the Town’s consent under G.L.c. 183A, §§5(b)(2)(ii) and 5(c).
The statute defines “limited common areas and facilities” as follows:
a portion of the common areas and facilities either (i) described in the master deed or (ii) granted or assigned in accordance with the provisions of this chapter by the governing body of the organization of unit owners, for the exclusive use of one or more but fewer than all of the units.
G.L.c. 183A, 81.
The Trustees have not, by the July 10,2000 parking rule, assigned “a portion of the common areas ... for the exclusive use of one or more but fewer than all of the units.” The 72 spaces are equally available to each unit owner, including the Senior Center, for the same purpose: to fulfill the mandate of Paragraph 10 of the Master Deed that “(t]here shall be appurtenant to each Unit the right to park one registered automobile in the area designated ‘Parking’. . .” Accordingly, I conclude that the Trustees have not designated a portion of the common parking area as a limited common area.
V. Alleged Jeopardizing of the Safety of Seniors and Others
Finally, the Town claims that the July 10, 2000 parking rule jeopardizes the safety of visitors to the Senior Center, in violation of Section 5.3 of the Trust (Trustees are responsible for “the proper operation, maintenance, repair and replacement of the Common Areas . . .”). Specifically, the Town alleges that the signs are placed in unsafe locations and jeopardize the safety of those driving into and through the parking area. Assuming that Section 5.3 encompasses safety, the Town has failed to establish by credible evidence that, after the initial confusion on July 14, 2000, when the Trustees first enforced the parking rule, there has been any adverse effect on safety.
The parties’ respective requests for findings and rulings are denied to the extent that they are inconsistent with the foregoing.
ORDER FOR DECLARATORY JUDGMENT
For the reasons stated above, it is ORDERED that declaratory judgment shall enter as follows:
1. The parking rule voted by the plaintiffs, Trustees of Muzzey High Condominium Trust, on or about July 10, 2000, regulating the use of the common parking area at Muzzey High Condominium, is valid and enforceable to the extent that it regulates use of the common parking area on weekdays after 4:30 p.m and before 8:00 a.m., and on Saturdays and Sundays.
2. The parking rule voted by the plaintiffs, Trustees of Muzzey High Condominium Trust, on or about July 10, 2000, regulating the use of the common parking area at Muzzey High Condominium, is invalid and unenforceable to the extent that it regulates use of the common parking area on weekdays after 8:00 a.m. and before 4:30 p.m.
3. The parking rule voted by the plaintiffs, Trustees of Muzzey High Condominium Trust, on or about July 10, 2000, may be enforced for the time periods specified in paragraph 1 above, in the manner utilized by the Trustees (i.e., free-standing metal signs designating “Muzzey Unit Owner Parking Only Including Permitted Residents one space per unit,” and “Senior Center Guest & Unit Owner/Resident Parking”), but only after such signs have been modified to denote the time periods during which the parking rule is in effect in accordance with paragraph 1.

At trial, the parties stipulated that there are 118 spaces. The number of spaces existing in the common parking area variously appears in trial exhibits as 117 or 118.

The Court notes also that, in their request for findings, the Trustees refer generally to parking difficulties, but make specific reference only to difficulties in the evenings and overnight. See Plaintiffs’ Request for Findings of Fact, Requests 8 and 15.

The Town also argues that it is not in violation of the Master Deed if Senior Center activities include some non-seniors. The Court has found that, in any event, non-senior visitors to the Senior Center do not significantly affect availability of parking.

In their Proposed Ruling No, 16, the Trustees quote Kaplan v. Boudreaux, 410 Mass. 435, 443 (1991) (in turn quoting Jarvis v. Stage Neck Owners Ass’n, 464 A.2d 952, 956 (Me. 1983)), to argue that the Supreme Judicial Court “has distinguished the granting of exclusive use interests from circumstances ‘in which some reasonable restrictions or regulation of the common areas is imposed on all owners.’ ”

As the discussion below indicates, the July 10, 2000 parking rule’s application to the weekday 8 a.m. to 4:30 p.m. period might well fail to satisfy even the “arbitrary and capricious” test.

The Trustees did not, and were not required to, conduct an investigation or formal study of parking at the Condominium where, as here, their experience over the years (as reflected in the evidence at trial) rendered them sufficiently knowledgeable and competent to regulate use of the common parking area. See Noble v. Murphy, supra at 458.

Indeed, in light of the Trustees’ October 29, 1999 statement quoted above, and the lack of evidence of any significant change in the facts supporting that statement in the ensuing eight months, there is sufficient evidence to support a ruling that application of the July 10, 2000 parking rule to the Senior Center’s normal business hours was arbitrary and capricious.