*Elvaton Towne Condominium Regime II, Inc., et al. v. William Kevin Rose*, *et ux*., No. 33, September Term, 2016

**CONDOMINIUMS — GENERAL COMMON ELEMENTS — TAKINGS —** While the Maryland Condominium Act does not preclude "suspension-of-privileges" methods as a means of enforcing collection of delinquent fees, such means must have been agreed to by the unit owners and incorporated into the Declaration. Where this means of collection is established by a rule, enacted by only a majority of the condominium association's governing council or board of directors rather than through an amendment to the Declaration, it is invalid as an interference in property rights beyond the power of the condominium's governing body to impose.

**DECLARATORY JUDGMENT — IDENTICAL ISSUES PENDING IN ANOTHER TRIBUNAL —** Maryland courts will not ordinarily grant declaratory judgment where a proceeding involving identical issues is already pending in another tribunal. In such a case, it is neither useful nor proper to issue declaratory relief, unless very unusual and compelling circumstances exist to do so.

Circuit Court for Anne Arundel County
Case No. 02-C-12-171433
Argued: January 5, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 33

September Term, 2016

_____

ELVATON TOWNE CONDOMINIUM
REGIME II, INC., ET AL.

v.

WILLIAM KEVIN ROSE, ET UX.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: June 23, 2017

The principal issue for consideration in the present case is the extent to which, and upon what authority, a condominium association may impose restrictions on a unit owner's right of access to communally-held property. The parties are Petitioners/Cross-Respondents Elvaton Towne Condominiums in Glen Burnie, its condominium association, and its management firm (collectively, "Elvaton") and Respondents/Cross-Petitioners William and Dawn Rose ("the Roses").

Elvaton's parking areas and the pool are general common elements, which, according to ¶ 7(C) of Elvaton's governing declaration, "shall be exclusively owned in common by all of the Unit Owners." Under the Maryland Condominium Act, Md. Code Ann., Real Prop. §§ 11-101(c), 11-107, a "general common element" is one over which every unit owner enjoys ownership rights. Unit owners are assessed an annual condominium fee, to be paid on a monthly basis, to cover, among other things, the maintenance of the common elements of the property, which include the parking lot and pool. As a means of enforcing collection of such debts, Elvaton's governing Board of Directors passed a "suspension-of-privileges" rule that prohibits unit owners who are delinquent in their payment of condominium fees from parking overnight within the complex and from using the pool, until such time as the delinquency is cured.

The dispute at issue here has its genesis in Elvaton's claim that the Roses were delinquent in paying their condominium fees. In addition to recording a statement of lien against the Roses' condominium unit and filing suit in the District Court sitting in Anne Arundel County to recover the alleged debt, Elvaton notified the Roses that, pursuant to the "suspension-of-privileges" rule, they were prohibited from parking in the parking lot

overnight or using the pool until such time as they paid their allegedly delinquent condominium fees. During the pendency of the District Court action, the Roses filed in the Circuit Court for Anne Arundel County a complaint seeking, among other relief, a declaratory judgment that (1) Elvaton did not possess the authority to prohibit them, on the basis of an alleged delinquency, from using the common elements of the Elvaton complex; and (2) the Roses did not owe a debt to Elvaton. The Roses also obtained a stay of the District Court proceedings during the pendency of the case in the circuit court.

Before trial, the circuit court ruled in favor of Elvaton that the Roses were not entitled to have the court issue a declaratory judgment on the validity of the alleged debt given that the issue was pending review in the District Court. Later, following a trial on the merits of the remaining counts of the Roses' complaint, the circuit court found in favor of the Roses on the validity of the rule. The court explained that Elvaton did not have the authority to restrict the Roses' use of the parking lots and the pool as a means of collecting on the debt, because Elvaton was not authorized by the condominium's governing documents to do so for the alleged failure to pay association assessments. Both Elvaton and the Roses appealed their respective adverse judgments, and the Court of Special Appeals affirmed both judgments of the circuit court. *Elvaton Towne Condo. Regime II, Inc. v. Rose*, No. 1033, Sept. Term, 2014, slip op. at 25, 32-33 (Md. Ct. Spec. App. filed Apr. 21, 2016). Both parties sought, and we granted, further review in this Court.

For the reasons that follow, we conclude that the Maryland Condominium Act, Md.

2

Code Ann., Real Property § 11-101 *et seq.* (1982, 2015 Repl. Vol.)[1] allows access to communally-held property, that is, the "general common elements" of the condominium, to be restricted as a means to enforce payment of condominium fees. Such restrictions, however, must first be authorized by the unit owners through agreement in the condominium's declaration. In the present case, Elvaton did not include such a restriction in its declaration. We therefore affirm the judgment of the Court of Special Appeals that came to the same conclusion. We likewise affirm the Court of Special Appeals' judgment that the Roses were not entitled to have the validity of the debt resolved in the circuit court, given its pendency in the District Court.

I

*Condominium Law, in a Nutshell*

"A condominium is a 'communal form of estate in property consisting of individually owned units which are supported by collectively held facilities and areas.'" *Ridgely Condo. Ass'n v. Smyrnioudis,* 343 Md. 357, 358 (1996) (quoting *Andrews v. City of Greenbelt*, 293 Md. 69, 71 (1982)). Owning property in common offers certain benefits to condominium owners, such as affordability and shared costs of property management, and in exchange condominium owners "agree to be bound by rules governing the administration, maintenance, and use of the property." *Id.* at 359 (footnote omitted). We have recognized that,

> inherent in the condominium concept is the principle that to promote the
> health, happiness, and peace of mind of the majority of the unit owners since
> they are living in such close proximity and using facilities in common, each

---

[1] Unless otherwise noted, all further statutory references are to the Real Property Article.

3

unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization.

*Id.* at 359 (quoting *Hidden Harbour Estates, Inc. v. Norman*, 309 So.2d 180, 181-82 (Fla. Dist. Ct. App. 1975)).

The Maryland Condominium Act (hereinafter, the "Act") "regulates the formation, management, and termination of condominiums in Maryland." *Jurgensen v. New Phoenix Atlantic Condo. Council of Unit Owners*, 380 Md. 106, 115 (2004). Under the Act, a condominium is established by recording a declaration, bylaws, and condominium plat among the land records of the county in which the property is located. § 11-102(a)(1).

The declaration, among other provisions, names the condominium, defines the common elements of the condominium, and assigns the percentage interests in the common elements appurtenant to each unit and the number of votes appurtenant to each unit at any council of unit owners. § 11-103. Declarations may be amended only by the written consent of eighty percent of the unit owners listed on the current roster. § 11-103(c)(1). The percentage interest in common elements appurtenant to each unit, however, "shall have a permanent character and . . . may not be changed without the written consent of *all* of the unit owners and their mortgagees." § 11-107(c) (emphasis added).

The Act further provides for the enactment of bylaws, which address the foundational aspects of the community's general management and operations. § 11-104(a) ("The administration of every condominium shall be governed by bylaws which shall be recorded with the declaration."). The bylaws describe the council of unit owners—the

4

governing body of a condominium—and its authority and the extent to which it may delegate its tasks to a board of directors or managers. § 11-104(b)(1). The bylaws also establish the method of voting by unit owners, including matters such as quorum and the method of calling for a gathering of unit owners. § 11-104(b)(3).

Of particular relevance here, the bylaws describe the "manner of assessing against and collecting from unit owners their respective shares of the common expenses" and "also may contain any other provision regarding the management and operation of the condominium including any restriction on or requirement respecting the use and maintenance of the units and the common elements." § 11-104(b)(4), (c). The fundamental governance agreements established in the bylaws may be modified, but only by a minimum two-thirds vote of the unit owners. § 11-104(e)(2).[2]

Condominiums also may "adopt and amend reasonable rules and regulations," consistent with the two foundational governing documents described above, that address less fundamental administrative needs of the community. §§ 11-109(d)(2), 11-111. Such rules are passed or amended, after notice and the opportunity for public comment, by simple majority vote of the council of unit owners or its delegated management entity. § 11-111(a)(1). Rules "generally deal with the use and occupancy by owners of units and common areas, patios and other exterior areas, parking, trash disposal, pets, etc. They

---

[2] The General Assembly recently enacted language that will alter this provision. Effective October 1, 2017, "the council of unit owners may amend the bylaws by the affirmative vote of unit owners in good standing having at least 60% of the votes in the council, or by a lower percentage if required in the bylaws." 2017 Maryland Laws Ch. 480. We acknowledge the pending changes to the statute but judge this case on the law extant at the time of the dispute.

5

frequently prohibit conduct that could constitute a nuisance." *Dulaney Towers Maintenance Corp. v. O'Brey*, 46 Md. App. 464, 466 (1980).

The Act clarifies the superiority of the declaration over the plat, bylaws, and any rules or regulations. Section 11-124(e) provides: "If there is any conflict among the provisions of this title, the declaration, condominium plat, bylaws, or rules adopted pursuant to § 11-111 of this title, the provisions of each shall control in the succession listed hereinbefore."

"A condominium owner . . . holds a hybrid property interest consisting of an exclusive ownership of a particular unit or apartment and a tenancy in common with the other co-owners in the common elements." *Ridgely*, 343 Md. at 358-59; § 11-107(a); *see also Andrews*, 293 Md. 69, 73-74. The "common elements" of condominium property, as well as its subsets, are defined in § 11-101(c) of the Act:

(1) "Common elements" means all of the condominium except the units.
(2) "Limited common elements" means those common elements identified in the declaration or on the condominium plat as reserved for the exclusive use of one or more but less than all of the unit owners.
(3) "General common elements" means all the common elements except the limited common elements.

Section 11-107(a) provides for communal ownership of common elements:

Each unit owner shall own an undivided percentage interest in the common elements equal to that set forth in the declaration. Except as specifically provided in this title, the common elements shall remain undivided.

Section 11-107(c) describes the nature of percentage interests in the common elements as follows:

The percentage interest provided in subsections (a) and (b) of this section may be identical or may vary. The percentage interests shall have a

6

permanent character and, except as specifically provided by this title, may not be changed without the written consent of all of the unit owners and their mortgagees. Any change shall be evidenced by an amendment to the declaration, recorded among the appropriate land records. The percentage interests may not be separated from the unit to which they appertain. Any instrument, matter, circumstance, action, occurrence, or proceeding in any manner affecting a unit also shall affect, in like manner, the percentage interests appurtenant to the unit.

Section 11-108(a) in turn provides:

Subject to the provisions of subsection (c) of this section, the common elements may be used only for the purposes for which they were intended and, except as provided in the declaration, the common elements shall be subject to *mutual rights of support, access, use, and enjoyment* by all unit owners.

(Emphasis added).

II

*Elvaton's Condominium Documents*

The "Declaration for Elvaton Towne Condominiums, Regime Two" (the "Declaration") was executed on May 27, 1975.[3]  Paragraph 13 of the Declaration makes each unit owner a voting member of the Council of Unit Owners, but Article V, §§ 2-3 of the Elvaton Towne Condominiums, Regime Two By-Laws (the "By-Laws") delegates authority to a Board of Directors, tasking it with the general administration of the condominium, including, pertinent here, the promulgation of rules and regulations respecting the use of common elements.

The Declaration provides that "all streets, curbs, sidewalks, . . . and parking areas,"

---

[3]  By all indications, the Declaration at issue in this litigation is that which was recorded in 1975.

are among the general common elements as to which each unit owner has a fractional ownership interest. ¶ 7(A). The Declaration at ¶ 7(B) further provides that there are "no limited common elements within the Regime created herein"; making clear that all common elements are "general common elements," as defined in § 11-101(c)(3). In addition, the developer stated at ¶ 15 of the Declaration that "[i]t is the intention of Developer that each Unit Owner . . . shall have the right to use all of the recreational facilities for so long as same, including swimming pool and bath house, shall exist . . . . This right shall be a right appurtenant to each condominium unit."

Paragraph 7(C) of the Declaration provides that "[t]he common elements shall be exclusively owned in common by all of the Unit Owners." Paragraph 7(F) further provides:

> Each Unit Owner, in proportion to his Percentage Interest, shall contribute toward payment of the Common Expenses, and no Unit Owner shall be exempt from contributing toward said Common Expenses either by waiver of the use or enjoyment of the common elements, or any of them, or by the abandonment of his unit. The contribution of each Unit Owner toward Common Expenses shall be determined, levied and assessed as a lien, all in the manner set forth in the By-Laws which are being recorded among the Land Records of Anne Arundel County simultaneously herewith.

The Elvaton By-Laws were executed the same day as the Declaration. Relevant here are Article V – Directors, Article IX – Condominium Fees/Assessments, and Article X – Use Restrictions.

Section 3 of Article V is entitled Powers and Duties and provides in pertinent part that the "Board of Directors shall have all the powers and duties necessary for the administration of the affairs of the Condominium," which include, among others, the power and duty,

8

(b) to establish and provide for the collection of assessments from the Unit Owners and for the assessment and/or enforcement of liens therefor in a manner consistent with the law and the provisions of these By-Laws and the Declaration[.]

. . . .

(d) to promulgate and enforce such rules and regulations, and such restrictions on, or requirements, as may be deemed proper respecting the use, occupancy and maintenance of the project, and the use of the general and limited common elements, as are designated, to prevent unreasonable interference with the use and occupancy of the Condominium and of the general and limited common elements by the Unit Owners, all of which shall be consistent with laws and the provisions of these By-Laws and the Declaration.

Section 1 of Article IX is entitled Annual Condominium Fees/Assessments and provides

in pertinent part:

(a) Each Unit Owner shall pay to the Council, monthly, a sum equal to one-twelfth (1/12) of the Unit Owner's proportionate share of the sum required by the Council pursuant to the Percentage Interests in Common Expenses and Common Profits . . . to meet its annual expenses[.]

Section 4 of Article IX, entitled Non-Payment of Assessment, provides in pertinent part:

(a) A Unit Owner shall be liable for all assessments, or installments thereof, coming due while he is the owner of a unit . . . .

(b) All assessments, until paid, together with interest on them and actual cost of collection, constitute a lien on the units on which they are assessed, if a statement of lien is recorded within two years after the date the assessment becomes due. . . .

(c) Any assessment, or installment thereof, not paid when due shall bear interest, from the date when due until paid at the rate not exceeding the maximum permissible legal rate per annum.

Section 7 of Article IX, entitled Enforcement, provides:

The lien may be enforced and foreclosed by the Council of Unit Owners, or any other person specified in the By-Laws, in the same manner, and subject to the same requirements, as the foreclosure of mortgages or deed of trusts on real property in the state containing a power of sale, or an assent to a decree.

9

Article X, entitled Use Restrictions, at § 3, "Prohibited Uses and Nuisances," provides:

> (b) There shall be no obstruction of any general common elements, except as herein provided. Nothing shall be stored upon any general common elements, except as herein provided, without the approval of the Board of Directors. Vehicular parking upon general common elements may be regulated by the Board of Directors[.]
> . . . .
> (r) There shall be no violation of any rules for the use of the general or limited common elements which may from time to time be adopted by the Board of Directors and promulgated among the Unit Owners by said Board in writing; and the Board of Directors is hereby, and elsewhere in these By-Laws, authorized to adopt such rules.

Article XV, entitled Amendment, provides:

> These By-Laws may be amended by the affirmative vote of Unit Owners representing 75% of the total votes of the Condominium Regime, as then constituted, at any meeting of the Unit Owners duly called for such purpose in accordance with the provisions of the Real Property Article, Section 11-104 of the Annotated Code of Maryland[.]

### III

### *The Litigation*

We noted at the outset that Elvaton, proceeding on the basis that the Roses were delinquent in payment of their condominium fees, recorded a Statement of Lien against the Roses' unit and filed suit against them in the District Court, seeking payment of the allegedly delinquent fees.[4] In addition, Elvaton notified the Roses that, pursuant to the "suspension-of-privileges" rule (hereinafter, the "Rule") promulgated by the Board of

---

[4] The record reflects that Elvaton filed a supplement to the debt collection suit on July 10, 2012. Elvaton asserted, as it had done in the original suit, that the Roses had been delinquent in their assessments since September 2010 and that their balance owed was $2,619.69, plus $140.73 in interest, $608.50 in attorney's fees, and a trial attendance fee to be determined.

10

Directors, the Roses were prohibited from parking overnight in the condominium parking area. The Rule promulgated by Elvaton provided that,

> the right to park within the Council's Property shall automatically be suspended for any unit owner . . . that is more than forty-five (45) days past due in the payment of condominium assessments and other charges for a condominium unit in the community. The suspension of the parking permit shall remain in effect until the unit's account is brought current.

Elvaton further notified the Roses that, pursuant to a rule that apparently had existed for many years, they were likewise precluded from using the condominium "community" pool during the summers of 2012 and 2013.

The Roses responded to Elvaton's action in the District Court by filing a six-count complaint in the Circuit Court for Anne Arundel County against Elvaton, its management company (Wentworth Property Management, LLC), and Elvaton's debt collection attorney, John Oliveri, and his firm, Oliveri & Associates, LLC. In this appeal, we are concerned only with Count One.[5]

Count One was an action for declaratory judgment, in which the Roses requested the court to make four declarations:

---

[5] The Roses voluntarily dismissed Count II, which alleged defamation by Elvaton and the debt collection attorney, John Oliveri. Count III alleged violations of the federal Fair Debt Collection Practices Act against Mr. Oliveri and his firm. Count III was dismissed with prejudice on July 17, 2013, when Mr. Oliveri and his firm were dismissed from the case as defendants. Count IV alleged violations of the Maryland Consumer Debt Collection Act against Mr. Oliveri, his firm, and Elvaton, and Count V alleged that the same parties also violated the Maryland Consumer Protection Act through their violations of the Maryland Consumer Debt Collection Act. Count VI, "Respondeat Superior," alleged violation of the same statutes as addressed in Counts II, III, IV, and V, but with Elvaton alone named as the defendant.

Following a hearing on the merits of the remaining claims, the circuit court issued a memorandum opinion and order, ruling in favor of Elvaton on all those claims.

(1) that this Court determine and adjudicate the property rights of the Roses and all Unit Owners as to the unhindered use of general common areas including parking areas and the community recreational areas; [and]

(2) that this Court determine and adjudicate the rights and liabilities of the parties with respect to the assessments and other fees allegedly due from the Roses to Elvaton; and

(3) that this Court determine and adjudicate the rights and liabilities of the parties with respect to the Statement of Lien; and

(4) that this Court declare the Statement of Lien recorded in the land records of Anne Arundel County at book 23888 page 0474 to be void *ab initio* or, in the alternative, released[.]

In addition to their complaint in circuit court, the Roses filed a request for stay of the delinquency action in District Court during the pendency of the circuit court proceedings. That request was granted.

Elvaton filed a motion for summary judgment in the circuit court action. After a hearing on the motion, the court granted summary judgment in Elvaton's favor on Declarations 2, 3, and 4 of Count One, ruling that these issues would be addressed in the District Court proceeding.

Trial followed on the remaining counts of the Roses' complaint. It is unnecessary for present purposes to summarize all the evidence presented. It is enough to note that Elvaton provided evidence that, at some point before June 1, 2012, the Roses had fallen behind on their monthly assessments. Mrs. Rose testified that a member of Elvaton's Board of Directors gave her a letter informing her that, because Elvaton considered the Roses to be delinquent on their assessments, effective June 1, 2012, the Roses would be prohibited from parking in either of their two assigned parking spaces. Mrs. Rose further

testified about email reminders to the community, on or about June 4, concerning a "new towing policy" that would be taking effect that week advising that any resident who is delinquent on the assessment would be prohibited from parking and, if parked, would be towed at the unit owner's expense. The Roses, therefore, parked on a county road outside the community. Mrs. Rose testified that the Roses were also barred from using the community pool for the summers of 2012 and 2013.

Following trial, the circuit court issued a Memorandum Opinion and Order detailing the court's findings and conclusions. The court found in favor of the Roses on Declaration 1 of Count I. The circuit court applied the Act and *Ridgely*, *supra*, in reasoning that Elvaton's action was an unauthorized taking of the Roses' property. The court determined that, because the Roses own a percentage share of the common elements of the condominium complex, Elvaton could not deprive the Roses of their property right to those common elements, even temporarily, without proper authority. The court recognized that the Act would allow for such debt collection practices had they been authorized by the Declaration; the Declaration, however, did not authorize that practice. Instead, Elvaton established that practice through a rule, which, pursuant to the governance structure of the condominium, is passed by majority vote of the governing Board of Directors. The court ruled that, given the absence in the Declaration of a provision authorizing Elvaton to employ such a debt collection practice, Elvaton could not deprive the Roses of their property interest in the common elements of the condominium complex.

Elvaton appealed the court's decision on the debt collection practices issue, and the Roses cross-appealed on their right to seek in the circuit court a declaratory judgment on

13

the alleged debt. The Court of Special Appeals affirmed the circuit court on both claims, prompting both Elvaton and the Roses to seek further review in this Court. We granted certiorari to review the parties' respective claims.[6] *Elvaton Towne Condo. v. Rose*, 449 Md. 409 (2016).

IV

The permissibility of Elvaton's debt collection practice is a purely legal question, which we review *de novo*. "[W]here an order [of the trial court] involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *Schisler v. State*, 394 Md. 519, 535 (2006) (citation omitted). It is the general rule, moreover, that "the construction or interpretation of all written instruments is a question of law for the court." *Olde Severna Park Improvement Ass'n v. Gunby*, 402 Md. 317, 329 (2007) (quoting *Gordy v. Ocean Park, Inc.*, 218 Md. 52, 60 (1958)).

Elvaton's primary argument is that the debt collection practices it instituted through its "suspension-of-privileges" Rule are not a taking of property because they are not

---

[6] Elvaton presented the following question in its petition:

> Whether Maryland law permits, and Elvaton's Declaration and Bylaws provide, the authority to implement rules that temporarily suspend unit owners who are delinquent in their condominium assessments from using the community parking lot and pool?

The Roses' cross-petition posed this question:

> Did the Court of Special Appeals err by finding that the Roses were precluded from pursuing a declaratory judgment related to Elvaton's Statement of Lien, which established an interest in the Roses' real property, and that the Roses' only procedural remedy was to pursue a defense in a money damages consumer collection action pending in the District Court?

permanent. Elvaton further argues, in the alternative, that the Rule is a reasonable use restriction authorized by the Declaration and By-Laws. Neither argument carries the day for Elvaton.

## A.

### *Does application of the Rule constitute an impermissible taking?*

The decisions of the circuit court and Court of Special Appeals on this argument were grounded in the facts of *Ridgely*. We therefore begin our discussion with a summary of that case.

*Ridgely* involved a dispute concerning certain unit owners' use of the lobby area of the building, a condominium composed of 232 residential units and seven ground floor units authorized for use as businesses. Each of the seven units were accessible from both the lobby and an exterior entrance. Some of those businesses allowed their customers to enter through the building's well-appointed lobby, a general common element of the condominium. 343 Md. at 363. Citing security concerns, the condominium association amended its bylaws to impose a permanent requirement that customers were to use only exterior entrances to access the businesses, not the lobby. *Id.* at 363-64.

Several of the commercial unit owners challenged the validity of this bylaw amendment as an unauthorized taking of their property. In our review of the relevant law of a number of our sister states, we noted that the cases "fall generally into two categories, . . . 'exclusive use cases' . . . [and] 'equality' cases." *Id.* at 367; *see also id.* at 367-69 (collecting cases). We quoted, with apparent approval, a decision of the Supreme Judicial Court of Maine, *Jarvis v. Stage Neck Owners Ass'n*, 464 A.2d 952 (Me. 1983), that drew

a clear distinction between the two classes of cases:

> There is a distinct difference between these cases, in which exclusive use, control and/or ownership of the common areas is taken from some or all of the unit owners and cases in which some reasonable restrictions or regulation of the common areas is imposed on all owners. In the first instance, each owner's percentage interest in the common area is altered. In the second instance, the percentage ownership interest is unaffected.

*Id.* at 369.

The *Ridgely* court held that the amendment of the bylaws constituted an unacceptable revocation of the business owners' percentage interest in the lobby because, for instance, the business owners could no longer convey to a subsequent purchaser the property right for visitors to use the lobby. *Id.* at 370. We explained that the lobby was held as a tenancy-in-common by all unit owners together and the right that the bylaws amendment revoked, that is, "the right to have their clients use the lobby," *id.* at 369, was not "a mere personal privilege," but rather was appurtenant to the condominium units and subject to conveyance with the units*, id.* at 370 (quoting *Griffith v. Montgomery Cty.*, 57 Md. App. 472, 485 (1984)). The *Ridgely* court reasoned that this right "resembles an easement, which is an interest in property." *Id.* at 369. Revoking this right through the bylaw amendment "was beyond the power of the [condominium] Association," and was therefore invalid. *Id.* at 371.

Elvaton argues that *Ridgely* does not control the outcome here because, in that case, the use restriction imposed was permanent, whereas here the restriction lasts only so long as the Roses remain delinquent in their fee payments. From that premise, Elvaton argues that enforcement of the suspension-of-privileges Rule does not constitute an unlawful

16

taking.[7] Elvaton argues that the Roses may, for instance, convey the right to park and use the pool to a subsequent buyer, a right which is accessible immediately upon payment of the delinquent fees.

We disagree. We explained in *Ridgely* that many courts discern no cognizable taking where the rule is of equal application to all unit owners. This is because where a rule is applied equally—for instance, closing an outdoor swimming pool during the cold winter months—the rule does not change any of the owners' relative percentage interest in the common elements. *See id.* at 369. Rather, such a rule is considered a reasonable use restriction. Every unit owners' use is restricted equally, and no unit owner gains at the expense of another. Where, however, a rule "disparately affect[s] a portion of unit owners by revoking a property interest they acquired when they purchased their units, without affecting the rights of the other unit owners," such as occurred here, there is a taking. *Id*. at 370.

The Roses "own an undivided percentage interest in the common elements" as provided by both the Declaration and § 11-107(a). The restriction imposed upon them adversely affected their property interests in two of the common elements of Elvaton that other residents of Elvaton continued to enjoy: the parking lot and the pool, which percentage interest, as provided by § 11-107(c), "shall have a permanent character and . . . may not be changed without the written consent of all of the unit owners and their

_____

[7] For purposes of examining Elvaton's arguments, we phrase the question as if the Roses' debt is proven, but we note again here that the debt is contested and has not been established.

17

mortgagees." Just as the bylaw amendment adversely affected the percentage property interest the commercial unit owners had in the *Ridgely* condominium's lobby, the "suspension-of-privileges" Rule adversely affected the Roses' percentage property interest in access to the parking lot and the pool.

We know, too, that "transfer of an interest that is smaller than an ownership interest would suffice to alter the percentage interest held by each owner." *Ridgely*, 343 Md. at 367 (internal alterations and quotations omitted) (quoting *Kaplan v. Boudreaux*, 573 N.E.2d 495, 499 (Mass. 1991)). The removal of the Roses' interest in the common elements of the parking lot and pool was sufficient to alter the percentage of the condominium held by them.

We further disagree with Elvaton that the restriction imposed upon the Roses is not a taking of their property interest in use of the parking lot and pool because the restriction is lifted once the Roses pay the debt owed. Elvaton points out that, unlike in *Ridgely* where the percentage interest in the common elements was altered permanently, here the effect is temporary—it is a property interference that lasts only until unit owners pay the debt. Elvaton raises this distinction to argue that, therefore, the condominium association may do whatever it likes in terms of property interference. But this argument goes too far. Section 11-107(c) provides that the percentage interest in common elements appurtenant to each unit "may not be changed without the written consent of all of the unit owners and their mortgagees." Elvaton is correct that the Rule here does not impose the sort of permanent change to percentage interests in a common element for which § 11-107(c) requires unanimous unit owner and mortgage lender agreement, but it does not follow that

18

any and every rule imposing only temporary effects on access to common elements is therefore allowable.

Instead, the governing provision here is § 11-108(a). That provision states that the "common elements may be used only for the purposes for which they were intended and, *except as provided in the declaration*, the common elements shall be subject to mutual rights of support, access, use, and enjoyment by all unit owners." Thus, the law envisions that the declaration of a particular community may restrict access, through the agreement of the unit owners in their declaration, to various common elements.

Assuming that the restriction imposed here was "temporary", for the reason asserted by Elvaton, we are not persuaded that the restriction is any less a "taking". We have found, for example, temporary takings to be actionable in other contexts, such as inverse condemnation law. *See Reichs Ford Rd. Joint Venture v. State Rds. Comm'n of the State Highway Admin.*, 388 Md. 500, 511 (2005) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949) (discussing proper compensation for temporary takings under federal law)).

Moreover, and in any event, we agree with the Court of Special Appeals in this case that "[t]here is no temporary-infringement exception from complying with the collection procedures in . . . the Act. If there were, a condominium association could collect disputed debts by 'temporarily' blocking a hallway or lobby to prevent a unit owner's accessing the unit." *Elvaton Towne Condo. Regime II, Inc. v. Rose*, No. 1033, Sept. Term, 2014, slip op. at 24 (Md. Ct. Spec. App. filed Apr. 21, 2016) (quoting Brief of Consumer Protection Division of the Office of the Attorney General of Maryland as Amicus supporting the

19

Roses on the suspension-of-privileges issue).

Restricting a condominium unit owner's access to communally-held property is a significant infringement of the owner's property rights—so significant that the General Assembly found it appropriate to require that such a restriction may be authorized only through a provision in the declaration, as evinced by the text of § 11-108(a).[8] We find it telling that the General Assembly previously allowed a community's bylaws to permit such a taking, but in 1976 revised the statute to permit these takings only through agreement in a community's declaration. *Compare* Maryland Condominium Act, 1974 Md. Laws 2163 *with* Maryland Condominium Act, 1976 Md. Laws 929. Here, as discussed below, Elvaton's Declaration does not include authority to restrict access to common elements temporarily, in order to enforce payment of fees, and Elvaton cannot accomplish this restriction through a mere rule.

B.

*Is the Rule authorized by the Declaration?*

Elvaton makes the additional argument that the "suspension-of-privileges" Rule is authorized by the existing Declaration and By-Laws  In support of this argument, Elvaton asserts that all unit owners have already agreed to allow suspension-of-privileges rules

---

[8] This is not to say that every temporary restraint on access to property rights made through a community's declaration will always be allowable. It is, for instance, conceivable that a restriction on access to a condominium's elevator which prevents a disabled person from accessing that person's privately-owned unit at all, or a restriction on access to the hallway leading to one's privately-owned unit, may not be permissible. Such circumstances are not before the Court in this case and we refrain from speculating further on these applications of the Maryland Condominium Act and laws such as the Americans with Disabilities Act.

through the broad language of the Declaration and By-Laws; therefore, there is no unauthorized taking of property here.

Reasonable use restrictions through rules are common and necessary in condominium management. As discussed above, such rules might, for example, close a pool overnight or during the cold winter months for reasons of safety and common sense regarding seasonal use patterns, and be applied equally to every unit owner. Standard regulation of common elements in the case of condominiums encompasses reasonable restrictions put in place under the authority of the governing documents for the good of all members, tied to some pragmatic general need, such as safe and secure facilities or to avoid wear and tear of communal facilities. These common-good regulations are clearly allowed by Maryland law. *See* § 11-104(c) ("[Bylaws] also may contain any other provision regarding the management and operation of the condominium including any restriction on or requirement respecting the use and maintenance of the units and the common elements.").

"In reviewing the validity of a rule, a court must determine whether the Board of Directors or Council of Unit Owners had the authority to promulgate the rule at issue under the Act, declaration, and bylaws." *Ridgely*, 343 Md. at 366. Elvaton's existing Declaration and By-Laws grant it broad powers to impose reasonable rules and enforce payment of delinquent fees. The Declaration, at ¶ 7(F), states that each unit owner "shall contribute toward payment of the Common Expenses," and the "contribution of each Unit Owner toward Common Expenses shall be determined, levied and assessed as a lien, all in the manner set forth in the By-Laws." We outlined earlier in this opinion that the By-Laws

21

anticipate and authorize the Board of Directors "to establish and provide for the collection of assessments from the Unit Owners and for the assessment and/or enforcement of liens therefor in a manner consistent with law and the provisions of these By-Laws and the Declaration"; and

> to promulgate and enforce such rules and regulations, and such restrictions on, or requirements, as may be deemed proper respecting the use, occupancy and maintenance of the project, and the use of the general and limited common elements, as are designated, to prevent unreasonable interference with the use and occupancy of the Condominium and of the general and limited common elements by the Unit Owners, all of which shall be consistent with laws and the provisions of these By-Laws and the Declaration.

By-Laws Article V, § 3.

The condominium's governing body is authorized to enforce payment of fees through the imposition of a lien, *id.* at Article IX, § 7, which "may be enforced and foreclosed" by the governing body "subject to the same requirements, as the foreclosure of mortgages or deeds of trusts on real property in the state containing a power of sale." The By-Laws anticipate the need for rules on parking, stating that "[v]ehicular parking upon general common elements may be regulated by the Board of Directors." *Id.* at Article X, § 3(b). And last, violation of any rules by a Unit Owner is prohibited: "There shall be no violation of any rules for the use of the general or limited common elements . . . adopted by the Board of Directors." *Id.* at Article X, § 3(r).

We have explained that, should a declaration allow it,[9] a suspension-of-privileges

---

[9] Elvaton makes an argument that, because the condominium association was established before the effective date of the 1976 reauthorization of the law, which requires the grant of authority for a taking of common elements be laid out in the declaration, the current law

22

use restriction on common elements may be permissible under the Act, so long as the restriction is authorized by the declaration. Elvaton contends that the existing Declaration is broad enough to embrace the suspension-of-privileges debt collection practice, and thus the Rule establishing that practice is valid. Elvaton points out, for instance, that the Declaration states that all unit owners are subject to the provisions of the By-Laws and rules that Elvaton's Board of Directors passes. Declaration, ¶ 11. The By-Laws provide authority for Elvaton to implement use restrictions of general common elements (explicitly including parking), to establish and provide for the collection of fees from unit owners, and to prohibit violation of the association's rules. By-Laws, Article X, § 3; Article V, § 3. Elvaton argues the circuit court and Court of Special Appeals failed to engage in a proper analysis of these broad provisions.

The Declaration here does not allow for such restrictions on communal property access, therefore Elvaton's Rule is invalid no matter how reasonable. No provision of the Declaration contemplates suspension-of-privileges rules, the parking areas are identified

___

does not apply to Elvaton. Instead, the earlier version of the law, which allows authority for a taking of common elements to be established in the declaration *or the bylaws*, should apply. This argument fails because neither Elvaton's Declaration nor its By-Laws provides express authority for such a taking. In addition, this case does not involve a question of retroactivity—the taking occurred in 2012. Elvaton's actions are judged under the then-current version of the law. The 1976 reauthorization says only that existing condominiums need not amend their "declaration or master deed, bylaws, or condominium plat . . . to comply with the requirements of this title." § 11-128(a) (1976 Supp.). It does not follow that this savings clause (seemingly designed to prevent existing governing documents from becoming invalid where elements of the document conflict with the revised law) requires that a forty-year-old version of the law applies to Elvaton and any other condominium established in 1975 or earlier.

as common elements, and the Declaration provides that "common elements shall be exclusively owned in common by all of the Unit Owners." Declaration, ¶ 7(C). The pool is also a common element, a recreational facility that each Unit Owner acquired rights over when buying property in the condominium. "[E]ach Unit Owner . . . shall have the right to use all of the recreational facilities . . . including swimming pool and bath house . . . . This right shall be a right appurtenant to each condominium unit." *Id.* at ¶ 15. Elvaton's reading of the existing Declaration and By-Laws is radically overbroad. While Elvaton cites to provisions that allow the Council to reasonably regulate parking and to create necessary rules for the complex, these are general grants of power to administer the condominium on day-to-day issues, not the sort of clear, unambiguous release of property rights that would be required to take the Roses' property interest, even temporarily, in general common elements. In fact, the By-Laws state precisely which methods are allowed for enforcing payment of past-due assessments, and those methods do not include restriction of parking and pool access: "All assessments, until paid, together with interest on them and actual cost of collection, constitute a lien on the units . . . [which] may be enforced and foreclosed by the Council of Unit Owners." By-Laws, Article IX, §§ 4(b), 7.

In sum, § 11-108(a) states that, "except as provided in the declaration, the common elements shall be subject to mutual rights of support, access, use, and enjoyment by all unit owners." Elvaton's Declaration does not provide for an exception that would restrict access to the common elements due to an alleged failure to pay fees. Thus, the "suspension-of-privileges" Rule is invalid as beyond the Council's power.

V

24

We turn now to the Roses' contention that the circuit court should have issued a declaratory judgment on the validity of their debt, even though that issue was pending review in the District Court. Relying on the rules governing declaratory judgment expressed in *Vargas-Aguila v. State, Office of Chief Medical Examiner*, 202 Md. App. 375, 382 (2011), and Courts and Judicial Proceedings Article § 3-409 of the Maryland Code, the circuit court ruled that here, where the precise issue at hand was already within the jurisdiction of the District Court but was stayed, and there were no unusual and compelling circumstances, the circuit court would not grant declaratory judgment. The Roses challenge that ruling.

A.

Courts and Judicial Proceedings § 3-409(a) provides that a court "*may* grant a declaratory judgment or decree in a civil case" (emphasis added). This Court has concluded that, therefore, "declaratory judgment generally is a discretionary type of relief." *Converge Servs. Group, LLC v. Curran,* 383 Md. 462, 477 (2004). Consequently, the trial judge's decision not to grant declaratory judgment is reviewed under the deferential abuse of discretion standard. *Sprenger v. Pub. Serv. Comm'n of Md.*, 400 Md. 1, 21 (2007).

B.

The courts of this State "will refuse [to issue declaratory judgment] where another court has jurisdiction of the issue, where a proceeding involving identical issues is already pending in another tribunal, where a special statutory remedy has been provided, or where another remedy will be more effective or appropriate under the circumstances." *Haynie v.*

25

*Gold Bond Bldg. Prods.*, 306 Md. 644, 651 (1986) (citation omitted). "In these cases it is neither useful nor proper to issue the declaration." *Id.* Ordering declaratory relief "to decide an issue, even though the issue is presented in another pending case between the parties" is reserved for "very unusual and compelling circumstances." *Id.* at 652 (citation omitted). This rule is applicable in both civil and criminal cases. *See A.S. Abell Co. v. Sweeney*, 274 Md. 715, 720 (1975).

We agree with the circuit court and the Court of Special Appeals that, because the validity of the Roses' alleged debt was already pending before the District Court, the circuit court, guided by our caselaw, was well within its discretion to dismiss Declarations (2), (3), and (4) in the absence of unusual and compelling circumstances, and no such circumstances are present here.

The Roses attempt to dissuade us by arguing that a compelling circumstance exists in that the District Court is a court of limited jurisdiction—it is not empowered to determine ownership interests in real property. *See* Cts. & Jud. Proc. § 4-402(b). The Roses claim that, therefore, the District Court may not make determinations related to the lien imposed by Elvaton on their unit. Yet it is plain, and undisputed by the parties, that the issue of the validity of the debt is properly before the District Court. The validity of the lien flows directly from that question, and thus the elimination of the lien is not an independent issue but instead only a remedy—one that the Roses may pursue should they be successful in winning the issue of the alleged debt.

Last, while it is true, as the Roses point out, that the District Court case could have been consolidated with the circuit court case if Elvaton requested that this be done, Elvaton

26

was not required to do so.  *See* Cts. & Jud. Proc. § 6-104(b)(1) (when related actions between same parties are filed in the District Court and a circuit court, the party who filed in the District Court may move to consolidate with the action pending in circuit court).  We also note that the Roses enjoyed the right to challenge Elvaton's imposition of a lien in circuit court at an earlier time, but neglected to make this challenge.  Elvaton filed its lien against the Roses pursuant to § 11-110(d), which grants condominiums the power to enforce delinquent condominium fees through "the imposition of a lien on a unit in accordance with the provisions of the Maryland Contract Lien Act."  In turn, the Maryland Contract Lien Act empowers unit owners to oppose that lien:

> A party to whom notice is given under subsection (a) of this section may, within 30 days after the notice is served on the party, file a complaint in the *circuit court* for the county in which any part of the property is located to determine whether probable cause exists for the establishment of a lien.

§ 14-203(c)(1) (emphasis added).  The Roses possessed this right to litigate the lien in circuit court, but did not invoke it at the time Elvaton filed its Statement of Lien.

The District Court had proper jurisdiction over the delinquent fee dispute, and we discern no unusual or compelling circumstances in this case that would entitle the Roses to have the dispute resolved in circuit court.  Therefore, the circuit court's decision not to grant declaratory relief was reasonable and does not constitute an abuse of discretion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT TO BE SPLIT EQUALLY BETWEEN THE PARTIES.**

27